658 A.2d 1211

IN THE MATTER OF LAWRENCE A. CARTON, III, JUDGE
OF THE OLD BRIDGE MUNICIPAL COURT.

Argued March 27, 1995—Decided June 2, 1995.

*Patrick J. Monahan, Jr.,* Counsel, argued the cause on behalf of Advisory Committee on Judicial Conduct.

*Thomas F. McGuane* argued the cause for respondent (*Carpenter, Bennett & Morrissey,* attorneys).

PER CURIAM.

This proceeding against respondent, Lawrence A. Carton, III, a municipal court judge, arose out of a letter from Robert E. Levy, Supervising Deputy Attorney General of the Office of New Jersey Attorney General, dated November 5, 1992, that he filed with the Advisory Committee on Judicial Conduct (Committee or ACJC). That letter advised that in the course of the Attorney General's investigation of the Old Bridge Municipal Court Clerk's Office, "certain actions were taken, and statements made, by Judge Lawrence Carton III of the Old Bridge Municipal Court, which may have been in violation of Canon 1 and Canon 2 of the *Code of Judicial Conduct.* Additionally, during the course of the investigation two other incidents have come to our attention which may constitute judicial misconduct."

A formal complaint was filed with the ACJC containing three counts. After three days of hearings in which eleven witnesses had testified and forty-three exhibits had been filed, the ACJC issued a presentment in which it found that respondent had violated certain Court Rules and Canons 1, 2A, and 2B of the *Code of Judicial Conduct.* Those violations consisted of making telephone calls to the municipal court judge and municipal prosecutor of another municipality in an attempt to influence the disposition of charges against a business owned by respondent (Count I); and permitting a fax transmission to be sent from his law office to the

judge of another municipal court about a matter pending in that court (Count II). The ACJC, however, dismissed Count III in which it was alleged that respondent had made remarks to the staff of the Old Bridge Municipal Court to intimidate them and otherwise persuade them not to cooperate with an investigation by the State Police of possible criminal activities by the clerk of that court. The ACJC recommended that this Court publicly reprimand respondent. We then ordered respondent to show cause why removal proceedings should not be initiated against him and why he should not otherwise be publicly disciplined.

Based on our independent review of the record, we concur in the ACJC's determination that respondent violated the standards of judicial conduct. Although we agree that respondent should be publicly reprimanded, we do so on different grounds than the ACJC. While we agree with the ACJC that clear-and-convincing evidence is present to support the ACJC's findings with respect to Count II, and that sufficient evidence is lacking to support Count III, our *de novo* examination of the record persuades us that the ethics charges against respondent with respect to Count I have not been established by clear-and-convincing evidence. We therefore dismiss Count I, the Sea Bright matter. Accordingly, the public reprimand that we impose is only for respondent's conduct in Count II, the Sayreville matter.

## I

### SEA BRIGHT—COUNT I

In determining the nature and extent of discipline, we "carefully scrutinize the substantive offenses that constitute the core of respondent's misconduct, the underlying facts and the surrounding circumstances." *In re Collester*, 126 *N.J.* 468, 472, 599 *A.*2d 1275 (1992) (citing *In re Connor*, 124 *N.J.* 18, 22, 589 *A.*2d 1347 (1991) (other citations omitted)). Our review of the surrounding circumstances leads us to conclude that the record does not contain clear-and-convincing evidence that respondent

violated the *Code of Judicial Conduct* with respect to the Sea Bright matter.

As previously observed, the allegations against the respondent in the presentment all arose out of the State's investigation of the Old Bridge Municipal Court Clerk's Office. Most of the testimony at the ACJC hearing focused on the allegations made in Count III—whether respondent's remarks to court clerks had been intended to impede the State's investigation.

In August 1990, several deputy clerks of the Old Bridge Municipal Court, led by First Assistant Deputy Clerk Carol Butewicz (Clerk Butewicz), compiled what they felt to be incriminating evidence against the Chief Clerk of that court, a close friend of respondent. Those clerks gave that evidence to the Old Bridge Police Department and to Judge Foley who also was a municipal judge in Old Bridge. Judge Foley turned that evidence over to the Attorney General's Office. Judge Foley also advised the deputy clerks to keep from respondent his and their involvement in the Attorney General's investigation.

During the course of that two-year investigation, Clerk Butewicz and Gail Taylor, another deputy clerk (Clerk Taylor), received a preliminary notice of charges and proposed disciplinary action on November 8, 1991. Both women were charged with neglect of duty, insubordination, and conduct unbecoming of a public/judicial employee. According to the notices that were signed by respondent, he alleged that Clerks Butewicz and Taylor participated in the filing of two false reports concerning him. The clerks were suspended with pay.

Five days after her suspension, during the state-police investigation on November 13, 1991, Clerk Butewicz reported to an Attorney General investigator that she had heard from another source that respondent had once tried to influence the municipal judge in Sayreville. That allegation formed the basis of Count II, the Sayreville incident.

Clerks Butewicz and Taylor then filed suit in 1991 against respondent and Old Bridge Township in the Chancery Division, alleging, among other things, wrongful discharge from employment because they had assisted in the Attorney General's investigation. The Assignment Judge appointed a special prosecutor who conducted an investigation, prepared the matter for trial, and took the position that the suspension of the clerks was proper. On May 18, 1992, the matter was settled. The plaintiffs dismissed their claims, and as part of that settlement, they were transferred to other positions within the township, and letters of public reprimand were permanently placed in their personnel files.

During the time they were suspended by respondent, Judge Foley requested that Clerks Butewicz and Taylor work in the Sea Bright Municipal Court. Judge Foley also was prepared to testify on behalf of Clerks Butewicz and Taylor in their civil action against respondent.

On September 23, 1992, after the conclusion of the wrongful-discharge case, Judge Foley was interviewed by the State Police with respect to allegations made by Clerk Butewicz that respondent had interfered with the Attorney General's investigation. When asked at the conclusion of the interview if he had anything else to add, he volunteered that respondent, seven months previously, during the pendency of the civil action, had had a conversation with him concerning two garbage summonses pending in Sea Bright. Although he could not recall the exact circumstances of the incident, he did recall that Clerks Butewicz and Taylor had been present at the Sea Bright Municipal Court when the alleged incident had taken place. That comment from Judge Foley was the genesis of Count I. Respondent first learned that Judge Foley claimed respondent called him about the $50 garbage summonses when he received the ACJC's complaint in December 1993.

The record indicates that two summonses were issued against a business establishment called Squash Court of Sea Bright and its manager, Ms. Glisson, charging illegal dumping of trash in viola-

tion of the governing sanitary code of Sea Bright. Initially, the matter was to be heard in the Sea Bright Municipal Court, but it was transferred to another court. Respondent owned the Squash Court. He testified that he had had no interest in the tickets and that Ms. Glisson had been going to take care of them and had done so.

The record also indicates that sometime in February 1992, Judge Foley, the municipal judge in Sea Bright as well as a municipal judge in Old Bridge, and respondent, the presiding judge in Old Bridge, had a telephone conversation. The initial call was made by Judge Foley to respondent, concerning the cancellation of some of Foley's Old Bridge Court sessions. Respondent returned Judge Foley's call, concerning the cancelled sessions. Understandably, because the conversation had occurred at least seven months before Judge Foley had mentioned it to the State Police, and because no written record of the conversation nor any report had been made, Judge Foley "couldn't recall the exact circumstances surrounding this incident." When Judge Foley testified before the ACJC, he still did not recall respondent's exact words. He testified, however, that respondent had "asked me about two tickets involving illegal dumping of [sic] garbage problem in the township." He also testified that respondent had told him that those tickets were a minor matter and that the Squash Court was not a good investment. Judge Foley believed that those comments had been an attempt to influence him. He further testified that he had quickly ended the conversation with respondent, telling him to speak to the local prosecutor about that matter.

Respondent, never having been confronted with the allegations until two years after the alleged incident, can specifically recall having returned Foley's call, but has no recollection of any discussion of the Sea Bright matter. He insists that he never received the summonses and never would have discussed their disposition with Judge Foley. Indeed, given the hostility between the two judges, he testified he would never have asked Foley for any help.

The Sea Bright Municipal Prosecutor, Mitchell Ansell, also testified that he had received a telephone call from respondent. He believes that the call referred to two summonses pending in Sea Bright. Respondent claims that the conversation concerned a letter dated February 25, 1992, from the Sea Bright Borough Clerk, advising respondent of a meeting scheduled for March 3, 1992, with the Mayor and Council and the Borough Prosecutor to discuss a general garbage problem. Respondent was unable to attend that meeting. Respondent testified that because Mr. Ansell had had no knowledge of the fact that respondent had received a letter from that borough clerk indicating that the borough prosecutor, among others, had requested respondent's presence at a meeting to discuss a general garbage problem, Mr. Ansell must have assumed that any conversation that he had had with respondent concerned garbage related to the garbage summonses, rather than to garbage generally.

Alluding to the difficulty in recalling an incident that happened three years before, Mr. Ansell testified that he had not taken respondent's comments to mean anything improper. Respondent was a party; it was his company that was being charged. As the prosecutor noted, parties before the Municipal Court routinely call the prosecutor. He did not perceive respondent's telephone call as an attempt to influence him. We believe that Ansell's attempt to restate its contents falls far short of corroboration of any attempt on the part of respondent to fix the case.

The Sea Bright matter is characterized by a paucity of evidence. Our review of the record before us leads us to disagree with the conclusion of the ACJC, but only on the question whether the ACJC clearly and convincingly demonstrated that respondent was guilty of such conduct. We have concluded that the proof does not rise to that level.

Any attempt by a judge to influence the disposition of a case for that judge's own benefit or for another's benefit, no matter how insignificant the case, no matter when it occurs, demands removal. The ACJC finding here, that respondent attempted to influence

Judge Foley to dismiss the charges against the company owned by respondent, if it were proven, would clearly demand a removal. The charge that respondent attempted to fix the case was an afterthought that followed an extensive investigation of other matters. That charge was not at all part of the original investigation. It resulted from an open-ended question near the conclusion of the investigation, a question put to Judge Foley about whether there was "anything else he wanted to tell" the investigators. One would assume that an attempt to fix a case would have been reported immediately by Judge Foley. However, Judge Foley did not report those comments then or anytime thereafter, but only volunteered the comments during the course of another investigation. The lateness of the charge and the circumstances under which it was made—following a long period of hostility between the two judges—is one factor in our determination today. Besides Judge Foley's version of the conversation—with which respondent's version totally differs—the only other proof is ambiguous. That corroboration is a conversation respondent had with the prosecutor at Judge Foley's request. Ultimately, however, the conversation's innocence, or at least its ambiguous quality, both in its origin and in its content, makes this proffered evidence weak in its alleged corroboration of the charge.

Another critical fact that leads to our conclusion is the circumstantial incredibility of the charge. Respondent was admitted to the Bar in 1963. He first served as a municipal court judge in 1966. In 1982, he became a municipal court judge in Old Bridge Township, serving since 1987, as the Presiding Judge of the Old Bridge Municipal Court. Respondent's prior record as an attorney and as a municipal court judge is unblemished. He served with distinction, and had an absolutely clear record insofar as judicial conduct is concerned. In this matter, respondent is portrayed as attempting to fix a case that at most would lead to a $50 fine, which involves a minimal offense. Such a proposition does not comport with common sense.

After the alleged illicit conversation, no complaint was filed and no report made until the information was volunteered amidst a background and history of substantial antagonism between the judges. With that background and on this record, we are unable to find that respondent is clearly and convincingly guilty.

Our conclusion is no reflection on the ACJC, or on Judge Foley. We recognize that the conversation could have taken place as Judge Foley stated, but its occurrence in the form he suggests has not been demonstrated by the requisite clear-and-convincing evidence that " 'should produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.' " *In re Purrazzella,* 134 *N.J.* 228, 240, 633 *A.*2d 507 (1993) (quoting *Aiello v. Knoll Golf Club,* 64 *N.J.Super.* 156, 162, 165 *A.*2d 531 (App.Div.1960)).

## II

### THE SAYREVILLE MATTER—COUNT II

■ Count II also arose from a remark made by Clerk Butewicz five days after respondent had filed the complaint against her and Clerk Taylor. Nonetheless, the record does establish that during the latter part of 1989, Robert J. McGowan, Jr., Judge of the Sayreville Municipal Court, received an unsigned fax transmission from respondent's law office. On this point, all parties agreed at the hearing before the ACJC, although they sharply disagreed about the subject matter of the fax. Neither Judge McGowan nor respondent was able to produce a copy of the fax in question.

Judge McGowan testified that he had no independent recollection of the incident, but was testifying from the report he had made in 1991 to the state-police investigator. In that report, Judge McGowan stated that the fax had contained a request by respondent for an adjournment of a scheduled case involving Mark Fallon, who had been charged with multiple disorderly persons offenses returnable in the Sayreville Municipal Court. Fallon is the son of Joan Fallon, who was respondent's court clerk at the

time.  The charges against him were filed on July 24, 1989.  The first scheduled trial date, August 17, 1989, was adjourned, and the matters were resolved by a plea agreement on October 3, 1989.

The ACJC presentment presents both views of the incident:

According to Judge McGowan, he telephoned Respondent after receiving the fax, which bore markings indicating it had come from Respondent's law office.  During the ensuing telephone conversation, Respondent told Judge McGowan that he was "just trying to help the kid out, the kid needed to contact your court to request an adjournment quickly."  Respondent told Judge McGowan that he had not personally sent the fax transmission but had permitted Mark Fallon to send it from Respondent's law office.  Judge McGowan replied that Respondent could not represent Mark Fallon and that it was improper for him to intercede on Fallon's behalf.  McGowan said that Respondent should not be involved in the matter at all, and Respondent replied that McGowan was blowing the incident out of proportion because Respondent was not asking him to do anything.

*    *    *    *    *    *    *    *

For his part, Respondent maintained before this Committee that Judge McGowan was mistaken in testifying that the contact concerned any case involving Mark Fallon.  According to Respondent, Joyce Wetstein, one of the employees of the Old Bridge Municipal Court, called him at his law office on Friday, October 13, 1989, because her son, Brian Wetstein, had been found guilty of an offense in the Sayreville Municipal Court and the appeal period was going to expire the following Monday.  Respondent told Ms. Wetstein to have Brian call him and Brian did so shortly thereafter.  When Brian Wetstein called Respondent, Respondent was in a hurry to go somewhere, and he told Brian to write out a summary about the case and, if all else failed, Respondent would help Brian draft a letter applying for a new trial to deliver to the judge in Sayreville that Monday.

When Respondent found out that Robert McGowan was the Judge of the Sayreville Municipal Court, he called McGowan's law office, identifying himself only as "Larry Carton," and asked to speak to McGowan.  Respondent's intention was "simply to ask him whether he would accept a letter from a lawyer—from a fellow who was no longer represented as an indication of a new trial."  Respondent spoke to McGowan's secretary, and she said that she would have him return the call.  He did not return the call.

The following Monday, October 16, Respondent had to be out of the office once again.  He called his office and asked one of his secretaries to call Judge McGowan's law office and ask if McGowan would be able to speak to him that morning.  Later on, he called back and spoke to the secretary once again.  She told him that she had called McGowan's law office and that McGowan's secretary had suggested she fax a request for adjournment to the office.  Respondent said that without checking with him, the secretary went ahead and drafted and faxed such a request.  Respondent told the Committee that he was upset at what his secretary had done, and he apologized profusely to Judge McGowan when they both attended a conference some months later.  Respondent denied, however, that

he had any telephone conversation about the matter with Judge McGowan at any time.

Respondent presented testimony from both Joyce Wetstein and Brian Wetstein in support of his contention that the fax transmission sent to Judge McGowan concerned Brian Wetstein and was sent by a secretary who acted without authorization. Respondent did not present testimony from that secretary; instead, he represented to the Committee that she had no memory of the event.

The ACJC properly concluded that irrespective of whether the fax was on behalf of Mark Fallon or Brian Wetstein, respondent's office undoubtedly sent a fax to Judge McGowan concerning a matter pending before him in court. Although determining that Brian Wetstein's account lacked credibility, the ACJC found that the evidence indicated that respondent had given him legal advice in a pending criminal matter. Giving respondent the benefit of any doubt, the ACJC found "that respondent is charged with the running of his office and his failure to do so properly in this instance gives rise to conduct prejudicial to the administration of justice that brings the judicial office into disrepute." Our independent review of the record leads us to agree with the findings of the ACJC.

## III

### *THE OLD BRIDGE MATTER—COUNT III*

■ Based on our *de novo* review of the record, we also agree with the ACJC's finding that the evidence does not clearly and convincingly show that respondent impeded or sought to impede the investigation by the State Police of the actions of the Office of the Chief Clerk of the Old Bridge Municipal Court. The ACJC's presentment fairly describes and explains the incident that led to Count III:

On August 20, 1990, the New Jersey State Police began an investigation into the Old Bridge Municipal Court by executing a warrant for the search of the files of that court. The investigation was begun after employees of the court compiled information to the effect that Joan Fallon, the clerk of that court, may have used her position to favor her sons and others by failing to schedule cases for trial, collect fines, enforce court orders or report traffic violations to the Division of Motor Vehicles.

In the Third Count of the Complaint before this Committee, it was alleged that Respondent had made a number of remarks to the members of his court staff to intimidate them and otherwise persuade them not to cooperate with the investigation being conducted by the State Police. Respondent acknowledged having made, if not the alleged remarks, remarks that were essentially the same; but he testified that he was referring not to the State Police but to the Old Bridge Police Department. Certain employees of the Old Bridge Municipal Court were close to officers of the Old Bridge Police Department and filed reports with that department concerning matters within the Old Bridge Municipal Court. It was, according to Respondent, with reference to such reports and contacts that he made the remarks in question.

Finding that the evidence presented was not "clear and convincing," the ACJC properly dismissed the Third Count of the complaint.

### IV

Accordingly, with the dismissal of Counts I and III, the discipline to be imposed on respondent results from his misconduct in connection with Count II, the Sayreville matter.

It has long been the rule that municipal court judges "shall not practice in any criminal, quasi-criminal or penal matter." R. 1:15–1(b). It is well-established that municipal court judges should not be contacting the judges or personnel of another municipal court on behalf of parties to matters pending before the other court. In re Santini, 126 N.J. 291, 298, 597 A.2d 1388 (1991) (citing In re Murray, 92 N.J. 567, 458 A.2d 116 (1983)).

In both Santini, supra, and Murray, supra, we disciplined two part-time municipal court judges for contacting officials in other municipal courts with respect to pending matters. In both cases, the judges recognized, as did respondent here, that they could not represent clients before another municipal court. Unfortunately, in both cases through a series of mishaps, they were unable to secure the immediate services of another attorney. In Santini, supra, the judge called a zoning officer, a municipal court clerk, and another municipal court judge to discuss the pending matter. 126 N.J. at 293–94, 597 A.2d 1388. Despite the fact that Santini's client was facing an arrest warrant from the municipal court, we emphasized that "[u]nder no condition may a municipal court

judge communicate with the judge or clerk of the court in which the proceeding is pending." *Id.* at 296, 597 *A.*2d 1388. The municipal court judge in *Murray, supra,* wrote a letter to a municipal court judge to advise him that his former clients were out of state. 92 *N.J.* at 570, 458 *A.*2d 116. Because of his position, we found that the municipal judge in *Murray, supra,* had used "his power, prestige, and influence" to persuade other judges and that such action was insensitive to public perceptions of his judicial role. *Id.* at 571, 458 *A.*2d 116. In both *Santini* and *Murray,* although unique time pressures and circumstances were involved and both judges had unblemished records, we found that they both violated judicial Canons 1, 2 and 3 of the *Code of Judicial Conduct.* As a result, both were publicly reprimanded.

Canons 1, 2, and 3 of the *Code of Judicial Conduct* set forth the law regarding this issue: Canon 1 requires a judge to uphold the integrity and independence of the judiciary; Canon 2 requires a judge to avoid any impropriety or even an appearance of impropriety; Canon 2B prohibits a judge from allowing social or other relationships to influence his or her judicial conduct or judgment, requires that a judge not lend the prestige of office to advance the private interests of others, and requires that a judge not convey or permit others to convey the impression that they are in a special position of influence; Canon 3A(6) prohibits a judge from either initiating or considering *ex parte* or other communications concerning a pending or impending proceeding.

We find that respondent has violated Canons 1, 2, and 3, and has engaged in "conduct prejudicial to the administration of justice that brings the judicial office into disrepute." *R.* 2:15–8(a)(6). Certainly by now, all municipal court judges should be well aware that they may not do what respondent did when he contacted McGowan.

Because of respondent's improper conduct in the Sayreville matter, we find that a public reprimand is warranted. Accordingly, we need not and do not refer this matter to a removal panel.

So ordered.

*For public reprimandment*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, STEIN and COLEMAN—6.

*Opposed*—None.

### ORDER

The Advisory Committee on Judicial Conduct having filed a three-count presentment with the Court in which it concluded that as a result of the charges addressed in counts one and two, respondent should be publicly reprimanded for violations of the *Code of Judicial Conduct* and *Rule* 2:15–8(a)(6) and that the charges in count three should be dismissed,

And the Court having issued an Order to Show Cause and having reviewed the record and considered the arguments of counsel,

And the Court having determined that the charges against respondent addressed in counts one and three of the presentment, having not been established by clear and convincing evidence, must be dismissed,

And the Court having further determined that the charges addressed in count two have been established by clear and convincing evidence,

And good cause appearing;

IT IS ORDERED that JUDGE LAWRENCE A. CARTON, III, is publicly reprimanded for his violations of Canons 1, 2, and 3 of the *Code of Judicial Conduct* and *Rule* 2:15–8(a)(6); and it is further

ORDERED that the charges addressed in counts one and three of the presentment of the Advisory Committee on Judicial Conduct are dismissed.