644 So.2d 75 (1994)
INQUIRY CONCERNING a Judge, No. 93-155, re Edward MILLER.
No. 82887.
Supreme Court of Florida.
October 13, 1994.
*76 Frank N. Kaney, Vice-Chairman and Ford L. Thompson, Gen. Counsel, Tallahassee, and David W. Spicer and Paul M. Adams, Sp. Counsel of Bobo, Spicer, Ciotoli, Fulford, Bocchino, DeBevoise & Le Clainche, West Palm Beach, for petitioner.
Don Beverly and James Tittle of Beverly & Tittle, P.A., West Palm Beach, for respondent.
PER CURIAM.
We have for review the Judicial Qualifications Commission's finding that Judge Edward Miller demonstrates a present unfitness to hold office and its recommendation that he be removed from office. We have jurisdiction based on article V, section 12 of the Florida Constitution. We decline to remove Miller from the office of county judge because we find that a public reprimand is the appropriate sanction.
Miller has been a county judge in Okeechobee County since 1988. In 1993 the JQC formally charged Miller with four charges: three involving letters to the local newspaper and one involving a child custody case over which he presided. The JQC charged Miller with violating four canons of the Code of Judicial Conduct: Canon 1 (a judge should uphold the integrity and independence of the judiciary); Canon 2 (a judge should avoid impropriety and the appearance of impropriety in all activities); Canon 3 (a judge should perform the duties of office impartially and diligently); and Canon 4 (a judge may engage in activities, including writing, to improve the law, the legal system, and the administration of justice).
The JQC made these findings of fact:
(1) Miller wrote a letter published in the Okeechobee News on March 31, 1993, about a sexual battery case over which he presided. The case involved a father's sexual battery on his daughter and lewd and lascivious acts in the child's presence. Miller sentenced the defendant to forty-five years in prison, which was more than the twelve-year guidelines sentence. The Fourth District Court of Appeal reversed and remanded for resentencing. Miller sentenced the defendant to twelve years in prison, then wrote a letter to the newspaper's editor expressing his displeasure. The letter included these statements:
And so the reasons for my shame and embarrassment. Yesterday, March 25, 1993, I resentenced this man to a total of 12 years in prison, when I felt, in truth and fact, that he should more properly be castrated and hung by the neck. ... I obeyed the law as I am bound to do, but I left the Constitution and the Bill of Rights lying in tatters on the floor of my court room. I am not ashamed to say that I wept when I sentenced this man.
*77 Edward A. Miller, Judge Forced To Reduce Sentence, Okeechobee News, Mar. 31, 1993 (emphasis added). Miller testified that, in retrospect, he might have gone too far in writing that paragraph. He said, however, that he thought his letter enhanced the reputation of the judiciary and did not show disrespect. He did not think the letter invited any motions for recusal in subsequent criminal cases involving rape.
(2) Miller wrote a letter published in the Okeechobee News on September 14, 1993, in which he said the criminal justice system no longer worked. He wrote:
The plain truth of the matter is that rather than alter a system that has now proven without a doubt to be incapable of dealing with crime, our society has altered itself and ignored the problem by sticking our heads in the sand like the proverbial ostrich until he wound up in the belly of the lion.
Edward A. Miller, All Americans Are Victimized by Crime, Okeechobee News, Sept. 14, 1993.
(3) Miller wrote a third letter published in the Okeechobee News on October 8, 1993, that said, "[n]o where in the Constitution does it say that we have to run our criminal justice system in such a crack-brained fashion." Edward A. Miller, Court System Isn't Fair to Victims of Crime, Okeechobee News, Oct. 8, 1993. Miller also criticized the sentencing guidelines and "clean, comfortable, air conditioned jail[s]." Id.
(4) Miller held a hearing in a child custody matter in March 1989 when he did not have jurisdiction. He gave the mother notice of the hearing only after the hearing began and forced her to act as her own attorney (even though the mother did not have any idea why she was in court). Miller modified the custody given to the mother and placed the child with her paternal grandparents. At the time, Miller had jurisdiction to hear temporary, but not permanent, child support and child custody cases. The basis asserted at the hearing for entering the change was an emergency because the mother's boyfriend was violent and the child was in danger. There was uncontroverted evidence that the boyfriend had never been violent with the child. A month after the hearing, Miller entered an amended order entitled "Amended Order Granting Temporary Relief." Miller testified that he could have handled the case "a whole lot better," but that he did not think he had done anything wrong.
The JQC made these recommendations:
(1) Miller did not violate any canons for writing the September 14, 1993, letter to the editor about the shortcomings of the criminal justice system.
(2) Miller violated the canons by writing the March 31, 1993, and October 8, 1993, letters to the editor. The JQC found that "[t]hese two letters ... reasonably called into question the impartiality of Judge Miller to try criminal cases." If the letters had been the only charges, the JQC would have recommended a public reprimand.
(3) Miller violated Canons 1, 2, and 3 in the child custody case. The JQC found clear and convincing evidence that the mother was not given adequate notice or an opportunity to be heard:
She was forced to a hearing in a near hysterical state and denied the opportunity to obtain a lawyer. She was likewise given no notice or opportunity to be heard on the amended order.
In short, the JQC found that Miller denied the mother her procedural due process rights in a case in which he did not even have jurisdiction. Because of Miller's actions, the mother did not get her daughter back for more than one year. By his conduct in this case, the JQC found that Miller demonstrated a present unfitness to hold office and recommended his removal.[1]
*78 The object of JQC disciplinary proceedings "is not to inflict punishment, but to determine whether one who exercises judicial power is unfit to hold a judgeship." In re Kelly, 238 So.2d 565, 569 (Fla. 1970), cert. denied, 401 U.S. 962, 91 S.Ct. 970, 28 L.Ed.2d 246 (1971). The evidence against a judge must be clear and convincing. In re LaMotte, 341 So.2d 513, 516 (Fla. 1977). The JQC's findings and recommendations have persuasive force and should be given great weight. This Court, however, has the ultimate power and responsibility to decide whether the evidence proves that a judge's conduct is unbecoming of a member of the judiciary. In re Graham, 620 So.2d 1273, 1275 (Fla. 1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1186, 127 L.Ed.2d 537 (1994).
Initially, we agree with the JQC that Miller's March 31, 1993, and October 8, 1993, letters to the local newspaper warrant a public reprimand. While Canon 4A allows a judge to write about "activities concerning the law, the legal system, and the administration of justice," a judge still must uphold the integrity and independence of the judiciary (Canon 1), avoid impropriety or its appearance (Canon 2), and perform the duties of office impartially and diligently (Canon 3). This Court has cautioned judges "against indiscriminately voicing their objection to the law lest they be misunderstood by the public as being unwilling to enforce the law as written, thereby undermining public confidence in the integrity and impartiality of the judiciary." In re Gridley, 417 So.2d 950, 954 (Fla. 1982). Although Miller indicated in his writings that he would uphold the law, it is nonetheless apparent that some of his comments could be interpreted as making him less than impartial.
Turning to the issue of the March 1989 hearing, we find that Miller's misconduct was serious, but does not warrant his removal from office. Instead, a public reprimand is appropriate. Our imposition of this sanction in no way undermines the seriousness of Miller's actions.
Among the JQC's reasons noted for its recommendation for removal was that Miller has repeatedly held ex parte communications since becoming a judge. No charges were brought for this conduct. This finding came about after Miller's campaign treasurer testified that Miller had presided over a case in which her son had been charged with DUI. In response to a JQC commissioner's question, Miller said he often has what could be characterized as ex parte communications. This obviously violates the canons of the Code of Judicial Conduct, and we take this opportunity to stress that such communications are not appropriate:
The Code of Judicial Conduct in Canon 3(A)(4) states that "[a] judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding." This canon implements a fundamental requirement for all judicial proceedings under our form of government. Except under limited circumstances, no party should be allowed the advantage of presenting matters to or having matters decided by the judge without notice to all other interested parties. This canon was written with the clear intent of excluding all ex parte communications except when they are expressly authorized by statutes or rules.
In re Clayton, 504 So.2d 394, 395 (Fla. 1987); see also Rose v. State, 601 So.2d 1181, 1184 (Fla. 1992) (Harding, J., concurring) (emphasizing that ex parte communications "can often damage the perception of fairness and should be avoided where at all possible").
In small counties, it has been a time-honored tradition for residents to look to a county judge for advice and counsel in many areas, including legal matters. The judicial canon that makes ex parte communications improper does not distinguish between sparsely populated and metropolitan areas. As our state and its jurisprudence have progressed, the practice of turning to a county judge for legal advice is no longer permitted. Although Miller was not formally charged with engaging in ex parte communications, this opinion should stand as a statement that such conduct will not be tolerated.
*79 Accordingly, we publicly reprimand Miller for writing the March 31, 1993, and October 8, 1993, letters and for his handling of the child custody case.
It is so ordered.
GRIMES, C.J., and SHAW, KOGAN, HARDING and WELLS, JJ., and McDONALD, Senior Justice, concur.
OVERTON, J., dissents with an opinion.
OVERTON, Justice, dissenting.
I dissent. For the judicial branch of government to maintain credibility with the public, the public must believe that judges will conduct judicial proceedings fairly and impartially. The requirement in Canon 3 of the Code of Judicial Conduct that a "judge should perform the duties of his office impartially" is basic to our system of justice.
When a judge takes sides by making public comments about a case, that judge has become an advocate. Moreover, such conduct causes the judge's impartiality to be questioned not only in the case on which the judge has commented but in all other similar cases. Consequently, our Code of Judicial Conduct requires the recusal of any judge who has made a public comment about a case that was favorable to an adverse party.
As Justice Terrell once said:
[T]he judiciary has ever been the poor man's shield against oppression, the rich man's defense against the mob... . It will save the minority from the tyranny of the majority and protect both from the ruthless hand of the demagogue. It is the saving quality that will make this government one of laws and not a government of men.
Glenn Terrell, The Judiciary in a Federal Republic, in The Florida Handbook 164, 167 (Allen Morris ed., 3rd ed. 1952). In making these comments, Justice Terrell was explaining the judicial branch's important function of protecting individual rights and the responsibility of judges to follow the law even when the law may be contrary to the majority view. When judges become advocates, they lose not only their impartiality, they also raise questions about their ability to follow the law.
In this instance, Judge Miller's comments were improper and reflected a lack of knowledge regarding established constitutional principles. Because of Judge Miller's inexperience, I can accept the imposition of a public reprimand as discipline for his misconduct in sending letters to a newspaper. His other conduct, however, causes me much more concern. In my view, one of the most important factors in determining the appropriate discipline in a judicial misconduct case is whether a party or other participant in the judicial process was injured or adversely affected by the misconduct of the judge. That factor is present here. First, in this case, a mother was denied custody of her child for one year as a result of Judge Miller's misconduct. Second, and equally as important, at the hearing before the Judicial Qualifications Commission, Judge Miller freely admitted that he engaged in ex parte discussions with parties about cases.
The JQC became aware of Judge Miller's ex parte communications as a result of testimony provided by one of Judge Miller's own witnesses. The witness, Mary Porter, was Judge Miller's former campaign treasurer. She was called by Judge Miller as a character witness in an attempt to establish Judge Miller's good reputation. In her testimony, she explained that she and her husband previously had owned a dry-cleaning business and that, during Judge Miller's campaign, she had stapled his campaign literature to every piece of dry-cleaning that left her shop. On cross-examination, she denied seeking any special assistance from Judge Miller in any matter before him. On redirect examination by Judge Miller's counsel, however, she admitted that Judge Miller had presided over a case in which her son had been charged with DUI. She also admitted that Judge Miller had continued the case three or four times and that the charge was eventually reduced to reckless driving. As a result of her testimony, Judge Miller testified as follows in explaining this incident:
[EXAMINATION BY MR. TATE:]
Q Did Mrs. Porter or Mr. Porter or any member of the Porter family talk to *80 you about this case with Mr. Eiche prior to your sentencing?
A I never sentenced 
Q Prior to your recusing yourself.
A I'm sure Mrs. Porter did. Yes.
Q She did talk to you?
A Yes.
Q To ask for advice?
A Not so much to ask for advice, to tell me what had happened and that Mr. Eiche's daddy was dying from cancer and that things were in an uproar.
And I told her that the only way that I would do this is if he wasn't going to get an attorney and if he was going to plead guilty; if he admitted that he had done this and was going to plead guilty, then I would tell the state attorney's office that this was the situation.
Q So you discussed the case with her prior to the hearing?
A Yes, sir. From that standpoint; not the facts.
Q Do you feel there was any impropriety in doing that?
A I didn't feel there was and don't really feel so now.
Q On reflection, you don't think there's any impropriety?
A Not under the circumstances of that case, as I have described it for you.
Q If a stranger called you and asked you to review a case with them that their son coming up, would you do that?
A Judge, I talk to people all of the time 
Q Just answer  specifically, if I called you and I was a resident of this county and you didn't know me and my son was arrested for DUI and I wanted to discuss the case with you, would you see me?
A Probably would.
Q And discuss the case with me?
A I would discuss it from the standpoint of what was probably going to happen to you, the same way I discuss it with police officers when they get arrest warrants and 
Q I'm not talking about a police officer. I'm talking about a citizen.
A I know.
... .
[EXAMINATION BY JUDGE FRANK:]
Q Do I understand you to say that you equate talking with a police officer who's seeking a warrant with talking to someone who's related to a person who is charged with a misdemeanor or a felony?
A Sir, there are a lot of people in this community that unfortunately they don't know who to go to to ask them, "What happens in court?" And 
Q Just one second. Are you telling me that the canons have a particularly unique application in Okeechobee County and not generally?
A No.
Q Therefore, because it's Okeechobee County, a small community, you will talk with people who may ultimately have a matter before you?
A A criminal matter.
Q Okay. A criminal matter.
A Yes, sir.
Q That's your practice?
A Happens all of the time. Yes, sir.
Q It happens with you all the time. Is that correct?
A Yes, sir.
Q And when you have such conversations with people who are involved in any way in cases pending before you, do you give the state's  these are criminal matters, now  notice that you're meeting with such people and talking about the cases with them?
A Let me put it this way: It's not normally a defendant, it's a family member 
Q It doesn't matter who it is. Do you give the state's attorney notice that you're having such a meeting?
A No.
Based on Judge Miller's admissions regarding numerous ex parte communications, it is obvious that he may have been wrongfully influenced in multiple cases and, to this day, parties in those cases are likely unaware of that influence. This misconduct, in my mind, *81 places Judge Miller on the brink of removal. We must ask ourselves the question of whether this type of misconduct, regardless of Judge Miller's good intentions, will continue to occur and whether litigants will continued to be adversely affected if Judge Miller remains on the bench. The JQC answered this question in the affirmative. The majority opinion, however, holds that Judge Miller's ex parte communications should not be considered in determining whether Judge Miller is to remain on the bench given that he was not formally charged with any misconduct regarding those communications. I disagree. The evidence clearly resulted from the testimony of Judge Miller's own witness and the evidence bears directly on the issue of whether the public will continue to be adversely affected if Judge Miller is allowed to remain on the bench.
When Judge Miller's conduct is considered as a whole, I find that I must agree with the JQC's answer to the critical question and its recommendation of removal. Consequently, I dissent.
NOTES
[1] This case generated strong sentiments among Okeechobee residents, many of whom wrote to Justices of this Court in support of or opposition to Miller. We note that this Court makes its decision in this case based on law and fact  and not based on the popularity of the judge. A letter-writing campaign is offensive to the orderly process of the Court because it may appear that Justices consider a judge's popularity in reaching a decision. The appropriate vehicle for those who are not parties to address communications to this Court is to request and receive permission to proceed as an amicus curiae.