683 A.2d 543

IN RE THE INQUIRY OF EVAN W. BROADBELT, J.M.C.

Argued January 17, 1996—Decided October 10, 1996.

502

*Francis X. Crahay* argued the cause for appellant, Evan W. Broadbelt, J.M.C. (*Tompkins, McGuire & Wachenfeld*, attorneys; Evan W. Broadbelt, J.M.C., pro se, on the briefs).

*Michael J. Haas*, Senior Deputy Attorney General, argued the cause for respondent, Advisory Committee on Extrajudicial Activities (*Deborah T. Poritz*, Attorney General of New Jersey, attorney; *Joseph L. Yannotti*, Assistant Attorney General, of counsel).

*Floyd Abrams*, a member of the New York bar, argued the cause for amicus curiae, Courtroom Television Network (*Robert S. Steinbaum*, attorney).

PER CURIAM.

This appeal concerns whether a sitting municipal court judge may appear on television to comment on cases pending in other jurisdictions. After the matter was referred to the Advisory Committee on Extrajudicial Activities, the Committee issued Opinion No. 13–95, which disapproved of Judge Broadbelt's appearances on "Court TV" and "Geraldo Live" as a commentator. We granted review, 142 *N.J.* 443, 663 *A.*2d 1352 (1995).

I

The facts are undisputed. Petitioner, Evan W. Broadbelt, has been a municipal court judge since 1982 and serves five municipalities in Monmouth and Ocean counties. A well-respected municipal judge, Judge Broadbelt appeared on "Court TV" in excess of fifty times since 1992 to serve as a guest commentator. Since November 1994, Judge Broadbelt appeared on CNBC on three occasions to provide guest commentary on the "O.J. Simpson case," *People v. Simpson,* No. BA097211 (Cal.Super.Ct.1995). He also appeared on a local television program in 1994 to discuss generally the jurisdiction and procedures of the municipal courts. Judge Broadbelt did not receive compensation for any of those television appearances.

In December 1994, Judge Lawrence M. Lawson, A.J.S.C., requested that all municipal court judges notify the Assignment Judge before making any television appearances. After twice giving Judge Broadbelt permission to appear on "Geraldo Live," Judge Lawson, on March 20, 1995, withdrew his approval and requested that Judge Broadbelt refrain from appearing on television. After Judge Broadbelt noted his disagreement with Judge Lawson's decision, Judge Lawson referred the issue to the Advisory Committee on Extrajudicial Activities (Committee). That Committee, which is appointed by this Court, accepts inquiries about extrajudicial activities from a judge or this Court. *R.*1:18A–1, –2. After an oral decision, the Committee issued Opinion No. 13–95, pursuant to *Rule* 1:18A–4, and determined that Judge Broadbelt's

activities did not conform with Canon 2 of the Code of Judicial Conduct (Code) and Guideline IV.C.1. of the Guidelines for Extrajudicial Activities for New Jersey Judges.

■ The Code consists of seven canons that provide guidance to judges on the manner in which they are to conduct themselves. The canons are intended to maintain the integrity of the judiciary and to foster public confidence in the integrity of the judiciary. *In re Seaman,* 133 *N.J.* 67, 96, 627 *A.*2d 106 (1993); *see* Pressler, *Current N.J. Court Rules,* comment on Code of Judicial Conduct, Canons 1 and 2 (1996). Although we conclude that Judge Broadbelt's conduct violated Canons 3A(8) and 2B, we note that we have not previously addressed the issues presented by this appeal and that adequate guidance concerning appearances by judges on television may not previously have been available.

II

■ Although not the focus of the Committee's determination, we first consider whether Judge Broadbelt's commentary violated Canon 3A(8). Canon 3 provides that judges "should perform the duties of judicial office impartially and diligently." Extrajudicial duties should not encroach on or conflict with those duties. *Report of Supreme Court Committee on Extrajudicial Activities,* 117 *N.J.L.J.* 367, 367 (Mar. 20, 1986) (*Report* ). Canon 3A(8) of the Code [1] provides:

> A judge should abstain from public comment about a pending or impending proceeding in any court and should require similar abstention on the part of court personnel subject to the judge's direction and control. This subsection does not prohibit judges from making public statements in the course of their official duties or from explaining for public information the procedures of the court.

Judge Broadbelt argues that Canon 3(A) does not govern his televised legal commentary about pending cases because his conduct was extrajudicial in nature, and not a "duty of office" subject to the strictures of Canon 3. Additionally, petitioner and *amicus*

---

[1] In the Model Code of Judicial Conduct this provision is contained in Canon 3A(6).

both urge this Court to apply Guideline III.A.5.a (which prohibits only comment on cases pending in New Jersey courts), contending that under that Guideline the conduct is permissible. *Amicus* asks this Court to adopt a special test, pursuant to which a judge would be prohibited from commenting on a pending case only if there is a showing of harm to the judicial system.

The Committee argues that Judge Broadbelt's conduct, although extrajudicial, is governed by Canon 3A(8). Moreover, the Committee argues that although the Canon and the Guideline conflict, the Canon should control.

 We find unpersuasive the judge's argument that the Canon does not apply because the judge's conduct is extrajudicial in nature. Canon 3A(8) specifically states that "[t]his subsection does not prohibit judges from making public statements in the course of their official duties...." That language suggests that the Canon applies both to public statements made in the course of a judge's official duties and to statements made that are independent of those duties.

Similarly, we find unpersuasive the judge's argument that Guideline III.A.5.a governs his conduct in this case. Guideline III.A.5.a provides:

> To preserve the independence and prestige ... respect for and confidence in the judicial office, and to dispel any doubt [about a judge's ability] to decide impartially any issue pending or likely to come before the judge, a judge, in speaking, lecturing or otherwise, shall not:
>
> a. comment on cases or proceedings pending in New Jersey courts except to explain what the issues are....

 Clearly, the Guideline limits the ban on public comments regarding pending cases to those public comments relating to cases pending in New Jersey. That limitation is inconsistent with the language of Canon 3A(8) that prohibits public comment regarding cases pending in *any court*. The phrase "any court" has been interpreted to refer to any court in any jurisdiction. *See In re Hey* ("*Hey* I"), 188 *W.Va.* 545, 425 *S.E.*2d 221, 222-24 (1992) (concluding that phrase "any court" includes courts other than commenting judge's court); N.Y. Adv. Comm. on Judicial Ethics,

Op. 93–133 (1994) (concluding that Canon prohibits judges from commenting on cases pending in any court, even those outside of judge's jurisdiction). We note that the Guidelines are not intended to supplant or modify the Code. *Report, supra,* 117 *N.J.L.J.* at 367. Moreover, the canons are to be construed broadly to vindicate their purpose of maintaining public confidence in the judicial system. *In re Blackman,* 124 *N.J.* 547, 554, 591 *A.*2d 1339 (1991).

Canon 3A(8) does not prohibit a judge from making statements in the course of his official duties. *In re Schenck,* 318 *Or.* 402, 870 *P.*2d 185, 201, *cert. denied,* —— *U.S.* ——, 115 *S.Ct.* 195, 130 *L. Ed.*2d 127 (1994). A judge may also make comments concerning court procedure. *Disciplinary Counsel v. Souers,* 66 *Ohio St.*3d 199, 611 *N.E.*2d 305, 306 (1993). A judge is not forbidden from commenting on a case that is no longer pending. *Goldman v. Nevada Comm'n on Judicial Discipline,* 108 *Nev.* 251, 830 *P.*2d 107, 136–37 (1992); *Wenger v. Commission on Judicial Performance,* 29 *Cal.*3d 615, 175 *Cal.Rptr.* 420, 431, 630 *P.*2d 954, 965 (1981). The Second Circuit Court of Appeals has ruled that the Canon is not violated when the judge's comments to the media about a pending case are a restatement of comments previously made by the commenting judge in open court. *United States v. Yonkers Bd. of Educ.,* 946 *F.*2d 180, 184–85 (1991).

In *In re Sheffield,* 465 *So.*2d 350 (Ala.1984), the court observed that although judges are prohibited from commenting about the merits of a pending case, a general discussion of legal principles is permitted. *Id.* at 355. As such, "judges walk a fine line between the duties and prohibitions of Canon 3A[ (8) ]." *Ibid.* In *Papa v. New Haven Fed'n of Teachers,* 186 *Conn.* 725, 444 *A.*2d 196, 208 (1982), the court stated that not all public comments made about a pending case will be improper and result in disqualification of the judge. Although the Canon clearly prohibits most forms of public comment about pending cases, the National Conference of State Trial Judges Committee on News Reporting and Fair Trial has suggested that

[j]udges should encourage representatives of the news media [to] inquire of them for background information relating to the operation of the court system. While judges may not comment on the merits of a pending case, a judge may and should explain legal terms, and concepts, procedures, and the issues involved in the case so as to permit the news representatives to cover the case more intelligently.... Often there is no one, other than the judge, who is in a position to give a detailed and impartial explanation of the case to the news media.

[*Sheffield, supra*, 465 *So.*2d at 355 (quoting Nat'l Conf. of State Trial Judges Comm. on News Reporting and Fair Trial, *Judicial Guidelines for Dealing with News Media Inquiries and Criticism* (5th Draft, June 5, 1984)).]

In *United States v. Garwood*, 16 *M.J.* 863, 868 (N.M.C.M.R. 1983), *aff'd*, 20 *M.J.* 148 (C.M.A.), *cert. denied*, 474 *U.S.* 1005, 106 *S.Ct.* 524, 88 *L.Ed.*2d 456 (1985), a trial judge engaged in press and media interviews on national broadcast networks, the television program "Nightline," and for the Associated Press. In those interviews, the judge expressed his opinion about tactical decisions by the defense, the relevance of certain discovery items, and his opinion on whether the defendant should take the stand in a pending case. *Ibid.* The reviewing court found the judge's conduct "inexcusable" and concluded that, no matter how well-motivated, the judge's comments crossed the line between permissible and impermissible commentary. *Id.* at 869.

In *In re Benoit*, 523 *A.*2d 1381, 1382–83 (Me.1987), the court found it inappropriate for a judge, after a case was remanded, to write a letter to the editor of a local newspaper defending his original sentences. The court stated that "citizens, whose legal rights and freedoms were at risk, were subjected to a public prejudgment of their cases by the very judge who was assigned to reimpose sentence. We cannot tolerate such a conspicuous display of judicial bias regarding pending cases." *Id.* at 1383 (footnotes omitted).

In *Ryan v. Commission on Judicial Performance*, 45 *Cal.*3d 518, 247 *Cal.Rptr.* 378, 754 *P.*2d 724 (1988), the court ruled that a judge clearly violated the dictates of Canon 3A(8) in three separate instances. In one, the judge discussed a draft opinion with the press before notifying the parties of his ruling. *Id.* 247 *Cal.Rptr.* at 392–93, 754 *P.*2d at 738. In another, the judge made

statements to the press concerning a pending contempt order. *Id.* at 392–94, 754 *P.*2d at 738–39. Finally, the judge discussed another pending matter with the press and wrote a letter to the editor of a local newspaper explaining his sentence in a specific case. *Id.* at 393–94, 754 *P.*2d at 739. In all three instances, the judge violated the Canon by commenting on pending cases. *Id.* at 392–94, 754 *P.*2d at 738–39; *see also Shapley v. Texas Dep't of Human Resources,* 581 *S.W.*2d 250, 253 (Tex.Civ.App.1979) (holding that judge violated Canon when he spoke to reporters about pending case, and that judge "gave public vent to a bias and prejudice").

The New York Advisory Committee on Judicial Ethics recently considered an analogous issue. Applying the Canon, the Advisory Committee disapproved of a full-time judge's appearances on Court TV to discuss cases pending in courts outside of the state. N.Y. Adv. Comm. on Jud. Ethics, Op. 93–133 (1994). The Committee stated:

> Comments and observations made in that regard could prove troublesome, especially in view of their immediacy in relation to the events being discussed. These comments and observations are being made solely in the context of and with special reference to an ongoing litigation, the trial of which (or a portion [thereof]) has been telecast that day. Remarks by the judge could thus be seen as lending a judicial imprimatur to legal positions being advanced by one of the parties in an existing legal action, which legal positions may not have yet been ultimately determined. Such remarks would constitute public comment about a pending matter and, therefore, are not permitted....
>
> *[Ibid.]*

The New Jersey Advisory Committee on Extrajudicial Activities has recommended that to avoid conduct in violation of Canon 3A(8) judges should not participate in seminars or symposia if the principal subject is a pending case, because "the give and take [of the discussion] might expose the judge to the hazard of ... commenting on the issues [in the pending case], no matter how hard the judge tried to avoid the pitfalls." Adv. Comm. on Judicial Ethics, Op. 1–89 (1989); Adv. Comm. on Judicial Ethics, Op. 3–88 (1988). The Advisory Committee also recommended that a judge should decline an invitation to participate in a law school

seminar on post-conviction issues in death penalty cases when the subject matter of the seminar is a pending capital case over which the judge presided. Adv. Comm. on Judicial Ethics, Op. 2–88 (1988).

The purpose of this Canon is to protect the integrity of the judiciary. *See Benoit, supra,* 523 A.2d at 1383. In *Benoit, supra,* the court stated that the Canon

prevents a judge from publicly prejudging or creating the appearance that he is prejudging any aspect of an issue that has not been finally decided. It thereby minimizes the risk that such comments will either unfairly prejudge individuals' rights or create a public impression that citizens are not being treated fairly because different judges may not agree as to how those citizens' rights should be decided under the law.

[*Ibid.*]

█ We find the Canon to be clear and unambiguous: a judge should not comment on pending cases in any jurisdiction. By prohibiting judges from commenting on pending cases in *any* court, we avoid the possibility of undue influence on the judicial process and the threat to public confidence posed by a judge from one jurisdiction criticizing the rulings or technique of a judge from a different jurisdiction. William G. Ross, *Extrajudicial Speech: Charting the Boundaries of Propriety,* 2 Geo. J. Legal Ethics 589, 598 (1989); *see also* David M. Rothman, *California Judicial Conduct Handbook* 1–39 (1990) (observing that judges should not comment on cases pending in courts outside of their jurisdictions because (1) such comments could affect outcome, (2) comments could appear to exert pressure on judge to decide a certain way, and (3) such comments could undermine public confidence in judicial decisions).

█ We conclude that Judge Broadbelt should not have commented on pending cases from any jurisdiction. Moreover, we are persuaded that Judge Broadbelt's commentary on pending cases on "Court TV" and on "Geraldo Live" was inappropriate and had the potential to compromise the integrity of the judiciary in New Jersey. We direct the Advisory Committee to modify Guideline III.A.5.a to conform with Canon 3A(8).

### III

We also determine whether Judge Broadbelt's conduct violated Canon 2B. Canon 2 states that a judge "should avoid impropriety and the appearance of impropriety in all activities." Canon 2B forbids a judge from "lend[ing] the prestige of office to advance the private interests of others...."[2] The Commentary to Canon 2B states:

> Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety and must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on personal conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.
>
> [Pressler, *supra*, comment on Canons 1 and 2.]

Judge Broadbelt argues that his appearance on commercial television programs to discuss pending cases is neither governed by nor violative of Canon 2B. The Advisory Committee insists that the judge's conduct violated Canon 2B because his regular television appearances allowed the prestige of his judicial office to advance the private interests of commercial television.

Our case law does not address this issue directly. None of our decisions concerning Canon 2 relate to a judge's appearance on a commercial television program. In *In re Santini*, 126 *N.J.* 291, 597 *A.*2d 1388 (1991), we found that a municipal court judge violated Canon 2 and *Rule* 1:15–1(b) when he telephoned another municipal court judge concerning his client's arrest on a warrant for failure to appear at a zoning hearing. *Id.* at 293–95, 597 *A.*2d 1388. We noted that a judge must not use his office to advance the private interest of others, nor should he convey or permit others to convey the impression that he is in a special position to exert influence. *Id.* at 295–96, 597 *A.*2d 1388 (citing *In re*

---

[2] Guideline IV.C.1, on which the Advisory Committee also relied in finding that Judge Broadbelt's requested appearances would be improper, contains language similar to Canon 2B. The guideline provides: "A judge should avoid lending the prestige of the office to advance the private interests of others and should avoid conveying or permitting others to convey the impression that they are in a special position to influence the judge."

*Murray,* 92 *N.J.* 567, 570, 458 *A.*2d 116 (1983)); *see also In re Anastasi,* 76 *N.J.* 510, 514, 388 *A.*2d 620 (1978) (holding that judge should not be voluntary character witness for friend applying for racing license because to do so lends prestige of judicial office to advance private interest of another).

Similarly, in *In re Blackman, supra,* 124 *N.J.* 547, 591 *A.*2d 1339, we found that a judge's attendance at a picnic hosted by a convicted felon violated Canon 2. We reiterated that judges are in a unique position, and "must accept restrictions of their personal activities that other citizens might find burdensome and intrusive." *Id.* at 551, 591 *A.*2d 1339. Because judges are the "subject of constant public scrutiny," *ibid.,* they must be diligent to ensure that their conduct does not create the appearance of impropriety.

In its initial report, the Advisory Committee on Extrajudicial Activities emphasized the importance of preserving the integrity of the judiciary. *Report, supra,* 117 *N.J.L.J.* at 367. The Committee stated:

> In a free and democratic society, the independence and integrity of the judiciary are essential. The public expects judges to be honest, competent and devoted to the fair and impartial administration of justice. Any deviation from these high standards or any perception on the part of the public that judges are deficient in any of these qualities will inevitably result in a loss of confidence in the judiciary and seriously impair its effectiveness.
>
> *[Id.* at 367.]

That Committee also addressed the issue of judges writing for commercial, law-related publications, and promulgated Guideline III.C concerning the circumstances under which a judge could write for a commercial publication. Most notably, judges writing for commercial publications may not receive any compensation for their work. The Committee noted:

> Writing differs from teaching and other forms of oral presentation in the degree of permanence of the record, the relative non-exclusivity of the body of readers and the opportunity for review and revision of the finished work. The need to avoid the appearance of prejudgment becomes more acute in the case of writing. A judge who has criticized the state of law or expressed a view on what the law ought to be in a published article or treatise may later, while on the bench, hear those views quoted by counsel during argument on the same issue. It would be difficult

for opposing counsel or litigants to become convinced that the judge would respond affirmatively to a contrary argument.

*[Report, supra, 117 N.J.L.J. at 368.]*

In 1961, the ABA issued an opinion barring judges from appearing on commercial television programs that simulate or recreate judicial proceedings on the ground that such appearances are prohibited by Canon 2B. ABA Comm. on Professional Ethics, Formal Op. 298 (1961). The opinion also stated, however, that it did not consider whether other programs such as panel discussions or interviews would be improper. *Ibid.* In the same year, the Association approved of a judge's appearance on "Meet the Press" because it was "distinctly ... a public service type [of show]" similar to a news report dealing with matters of general public interest. ABA Comm. on Professional Ethics, Informal Op. C–230(g) (1961). Moreover, the Committee stated that "the nature of the program and the nature of the appearance of the lawyer or judge on it is the important thing and whether or not it is commercially sponsored is secondary." *Ibid.*

In Opinion No. 14–1991, the South Carolina Advisory Committee on Standards of Judicial Conduct addressed an analogous question. The Committee decided that Canon 2 prohibited a judge from answering questions on a radio talk show. S.C. Adv. Comm. on Standards of Judicial Conduct, Op. 14–1991 (1991). The Committee stated that "[i]n associating himself with the question and answer Radio Talk Show on a regular basis, the judge would clearly lend the prestige of his office to the advancement of the radio station, in an area where the public perceives him to be an expert." *Ibid.* Furthermore, the Committee added that "[t]he spontaneous interchange between the judge and the call in listener could well affect the dignity of the judge, his office and interfere with his performance of his judicial office, as well as, having [a] negative impact on the dignity of other members of the judiciary and the effectiveness of their performance of their judicial duties." *Ibid.* The South Carolina Committee focused on the nature and effect of the judge's conduct, and not merely on whether the show was commercial or non-commercial.

The purpose of Canon 2B is to protect the independence and integrity of the judiciary. That a judge may not lend the prestige of judicial office to advance the private interests of others is well settled. However, the question whether a judge lends the prestige of office to a television program merely by appearing on that program is more difficult to answer. A number of factors must be taken into account: the frequency with which the judge appears on the program, the intended audience, the subject matter, and whether the program is commercial or noncommercial. In general, a judge should avoid appearing on either commercial or non-commercial programs when the judge's association with that program compromises the independence and integrity of the judiciary.

In the instant case, Judge Broadbelt's regular appearances on commercial television violated Canon 2B. Because of the frequency of Judge Broadbelt's appearances, Judge Broadbelt became regularly identified with the program, thereby lending it the prestige of his judicial office.

Not every television appearance by a judge on commercial television will be improper, or will create the appearance of impropriety. For example, it might be permissible for a municipal court judge to make an isolated appearance on public television to comment on the role of municipal court judges in the judiciary. Similarly, a one-time appearance by a Superior Court judge on a commercial television program dealing with the benefits and disadvantages of televising civil trials might be permissible. However, a judge's regular weekly appearance on a television program, whether the program was commercial or non-commercial, to comment on recent court decisions in New Jersey clearly would be improper.

Because our experience is evolving, we need not now attempt to prescribe precise limits for judicial appearances on television programs. We note only that exceptional caution and discretion are essential. We anticipate that the Advisory Committee on

Extrajudicial Activities will perform a vital role in formulating standards to govern all such appearances in the future.

## IV

The final Canon involved in this case is Canon 4. Canon 4 states that a judge "may engage in activities to improve the law, the legal system, and the administration of justice." It further provides:

> A judge, subject to the proper performance of judicial duties, may engage in the following quasi-judicial activities if in doing so the judge does not cast doubt on the judge's capacity to decide impartially any issue that may come before the court and provided the judge is not compensated therefor:
>
> A. A judge may speak, write, lecture, and participate in other activities concerning the law, the legal system, and the administration of justice.
> B. A judge may teach concerning the law, the legal system, and the administration of justice.
>
> [Code of Judicial Conduct, Canon 4.]

Petitioner insists that his conduct is governed and permitted by Canon 4 because it is extrajudicial in nature and constitutes teaching about the judicial system. The Committee argues that the judge's conduct is not subject to review solely under Canon 4 because it is extrajudicial in nature; rather, the conduct is to be examined under each of the canons to determine its propriety.

Canon 4 does not excuse the violations of other canons. *Schenck, supra,* 870 *P.*2d at 202; *In re Miller,* 644 *So.*2d 75, 78 (Fla.1994). In Opinion 93–133, *supra,* the New York Advisory Committee on Judicial Ethics concluded that although a judge's comments concerning a pending case may be of educational value under Canon 4, because the comments violate another canon they are not permitted. *See also* Adv. Comm. on Judicial Ethics, Op. 3–88, *supra* (concluding that judge's comments about pending case, which are barred by Canon 3A(8), are not excused because they could be of some assistance to court under Canon 4).

We have no doubt that Petitioner Broadbelt's commentary was informative and educational. Nevertheless, conduct that is violative of another canon is not excused because it appears to be

authorized by Canon 4. Although Petitioner's conduct may have included teaching about the law, the legal system, and the administration of justice, that conduct is not permitted if it violates another canon. Accordingly, because Petitioner's conduct violated Canons 3A(8) and 2B, Canon 4 does not excuse it.

## V

Finally, we address the constitutional question whether placing restrictions on a judge's speech violates the First Amendment. A judge does not relinquish his or her First Amendment rights on ascending to the bench. *In re Rome,* 218 *Kan.* 198, 542 *P.*2d 676, 684 (1975); William G. Ross, *Extrajudicial Speech: Charting the Boundaries of Propriety,* 2 *Geo. J. Legal Ethics,* 589, 594 (1989). However, limitations may be placed on a judge's First Amendment rights. *See Halleck v. Berliner,* 427 *F.Supp.* 1225, 1239 (D.D.C.1977); *see also Scott v. Flowers,* 910 *F.*2d 201, 212 (5th Cir.1990) (observing that "state may restrict the speech of elected *judges* in ways that it may not restrict the speech of other elected officials"); *In re Hey,* ("*Hey* II"), 192 *W.Va.* 221, 452 *S.E.*2d 24, 30 (1994) (same).

In analyzing a judge's right to speak freely, courts have employed different constitutional standards: the *Pickering* public-employee balancing test, the strict-scrutiny test, and the hybrid *Pickering*/strict-scrutiny test. In addition, commentators have advocated that courts apply the *Gentile v. State Bar of Nevada,* 501 *U.S.* 1030, 111 *S.Ct.* 2720, 115 *L.Ed.*2d 888 (1991) middle-tier scrutiny standard to regulate judicial speech. Erwin Chemerinsky, *Is it the Siren's Call?: Judges and Free Speech While Cases are Pending,* 28 *Loy. L.A. L.Rev.* 831, 842 (1995).

In *Pickering,* the Court observed that although public employees do not shed their constitutional protections on entering the workplace, a public employee's free speech may be limited. *Pickering v. Board of Educ.,* 391 *U.S.* 563, 568, 88 *S.Ct.* 1731, 1734, 20 *L.Ed.*2d 811, 817 (1968); *see Hey* II, *supra,* 452 *S.E.*2d at 30–31; *Schenck, supra,* 870 *P.*2d at 204; *Scott, supra,* 910 *F.*2d at 210.

The *Pickering* test has two prongs: first, whether the speech addresses a matter of legitimate public concern; and second, whether the public employee's right to speak freely outweighs the public employer's interest in regulating the speech to promote the efficiency of the public services it performs. *Id.* at 567–70, 88 *S.Ct.* at 1734–35, 20 *L.Ed.*2d at 817.

Some courts have applied the strict-scrutiny test to this issue. To pass constitutional muster under strict scrutiny, regulations attempting to restrict a judge's right to speak freely must be (1) narrowly tailored to serve a compelling governmental interest; and (2) the least restrictive means available to achieve that interest. *Barone v. Department of Human Serv.,* 107 *N.J.* 355, 365, 526 *A.*2d 1055 (1987) (citing *Graham v. Richardson,* 403 *U.S.* 365, 91 *S.Ct.* 1848, 29 *L.Ed.*2d 534 (1971)).

West Virginia and Florida have applied a hybrid *Pickering* /strict-scrutiny test. In *Hey* II, *supra,* the West Virginia Supreme Court found that the compelling needs in maintaining the integrity of the judiciary justified "unusually stringent restrictions on judicial expression...." *Hey* II, *supra,* 452 *S.E.*2d at 30. Finding that the public employee/*Pickering* cases provided an appropriate analogy, *ibid.,* the court defined the test as a two-part inquiry: (1) whether the state could accomplish its legitimate interest in restraining a judge's speech through narrowly-tailored limitations, and (2) whether the regulation exceeded that which is necessary to accomplish the state's interests. *Id.* at 31. Engaging in that analysis, the court found that Canons 1, 2, and 3, which restricted a judge's free speech rights, were not violative of the First Amendment. *Ibid.; see also In re Judicial Conduct,* 603 *So.*2d 494, 498 (Fla.1992) (finding that judge's activity could be regulated because of special role judges play in society, and finding that Canons involved compelling state interest and were narrowly drawn to serve that interest).

We have applied a middle-tier scrutiny test in cases involving regulation of an attorney's speech about pending cases. *In re Rachmiel,* 90 *N.J.* 646, 654, 449 *A.*2d 505 (1982); *In re Hinds,* 90

*N.J.* 604, 614, 449 *A.*2d 483 (1982). In *Hinds*, we found that a disciplinary rule forbidding an attorney from commenting on a pending case did not violate the First Amendment.[3] We applied a two-prong test, in which a regulation will be found constitutional if it (1) "further[s] an important or substantial governmental interest unrelated to the suppression of expression"; and (2) is no more restrictive than necessary to protect the governmental interest involved. *Hinds, supra,* 90 *N.J.* at 614, 449 *A.*2d 483; *Rachmiel, supra,* 90 *N.J.* at 654–55, 449 *A.*2d 505.

When presented with a similar issue, the United States Supreme Court adopted the *Hinds* middle-tier scrutiny test and concluded that a state may regulate an attorney's speech if it creates a "substantial likelihood of materially prejudicing [an adjudicatory] proceeding." *Gentile v. State Bar of Nevada,* 501 *U.S.* 1030, 1075–76, 111 *S.Ct.* 2720, 2745, 115 *L.Ed.*2d 888, 923–24 (1991).

Although we believe that the imposition of restrictions on a judge's free speech rights would probably pass constitutional muster under any of those standards, we find most appropriate the *Gentile /Hinds* standard. Under that standard, the regulation of a judge's speech will be upheld if it furthers a substantial governmental interest unrelated to suppression of expression, and is no more restrictive than necessary. Avoiding material prejudice to an adjudicatory proceeding is one example of a governmental interest sufficient to uphold restrictions on a judge's speech. The preservation of the independence and integrity of the judiciary and the maintenance of public confidence in the judiciary—the

---

[3] The Disciplinary Rule in question provided:

> During the selection of a jury or the trial of a criminal matter, a lawyer or law firm associated with the prosecution or defense of a criminal matter shall not make or participate in making an extrajudicial statement that he expects to be disseminated by means of public communication and that relates to the trial, parties, or issues in the trial or other matters that are reasonably likely to interfere with a fair trial....
>
> [DR 7–107(D), *superseded by* RPC 3.6.]

interests underlying Canons 3A(8) and 2B—are obviously interests of sufficient magnitude to sustain those Canons under the *Gentile /Hinds* standard, and we are satisfied that the restrictions on a judge's speech imposed by those Canons are no greater than necessary. Accordingly, we uphold the constitutionality of their application to Petitioner.

## VI

As modified by this opinion, we affirm Opinion No. 13–95 of the Advisory Committee on Extrajudicial Activities.

*For affirmance and modification*—Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—6.

*Opposed*—None.