764 A.2d 398

IN THE MATTER OF JUDGE WOLF A. SAMAY, JUDGE
OF THE MUNICIPAL COURT OF PASSAIC.

Argued November 8, 2000—Decided January 12, 2001.

26

28

*Jeffrey J. Miller*, Assistant Attorney General, argued the cause on behalf of the Advisory Committee on Judicial Conduct (*John J. Farmer, Jr.*, Attorney General of New Jersey, attorney; *Mark J. Fleming* and *Michael J. Haas*, Assistant Attorneys General and *Dawn C. O'Connor*, Deputy Attorney General, on the brief).

*Peter W. Till*, argued the cause for respondent.

PER CURIAM.

This is a judicial-disciplinary case. The proceedings commenced with the filing of a complaint and an amended complaint with the Advisory Committee on Judicial Conduct (ACJC or Committee) against respondent, Wolf A. Samay, a Judge of the Municipal Court of the City of Passaic, for cause involving his judicial conduct. The gravamen of the complaint was that respondent had violated several Canons of the Code of Judicial Conduct and the Court's Disciplinary Rules.

The ACJC issued a presentment in which it found the allegations in the amended complaint had been established by clear and convincing evidence and that respondent violated Canons 1, 2A, 2B, 3A(1), and 3C(1) of the Code of Judicial Conduct, and *Rule* 2:15–8(a)(1) and *Rule* 2:15–8(a)(6). The presentment concluded that respondent "is not fit to continue to serve as a judge in the State of New Jersey" and recommended "that proceedings be

instituted to remove him from judicial office in accordance with Rule 2:14–1 and *N.J.S.A.* 2B:2A–1 to –11."

This Court issued and filed a formal Complaint and Order to Show Cause why respondent should not be removed from office. The Chief Justice, pursuant to *N.J.S.A.* 2B:2A–7, appointed a hearing panel, consisting of one Appellate Division judge and two Law Division judges, "to conduct a hearing, take evidence, and report findings" with respect to the complaint. The hearing panel concluded that respondent violated Canons 1, 2A, 2B, 3A(1), and 3C(1) of the Code of Judicial Conduct, and *Rules* 2:15–8(a)(1) and (a)(6). It unanimously recommended removal.

## I.

First, we articulate a few principles that inform and guide us in the performance of our responsibility. Matters of judicial discipline brought before this Court on the presentment of the ACJC receive a *de novo* review of the record. Where a form of discipline short of removal is to be imposed, we apply a clear and convincing burden of proof. *In re Collester*, 126 *N.J.* 468, 476, 599 *A.2d* 1275 (1992). Clear and convincing "evidence is that which 'produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established,' evidence 'so clear, direct and weighty and convincing as to enable (the factfinder) to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.'" *In re Boardwalk Regency Corp.*, 180 *N.J.Super.* 324, 339, 434 *A.2d* 1111 (App.Div.1981) (alteration in original) (quoting *Aiello v. Knoll Golf Club*, 64 *N.J.Super.* 156, 162, 165 *A.2d* 531 (App.Div.1960)), *modified*, 90 *N.J.* 361, 447 *A.2d* 1335 (1982), *appeal dismissed sub nom*, *Perlman v. Attorney Gen.*, 459 *U.S.* 1081, 103 *S.Ct.* 562, 74 *L.Ed.2d* 927 (1982); *see In re Purrazzella*, 134 *N.J.* 228, 240, 633 *A.2d* 507 (1993); Biunno, *Current N.J. Rules of Evidence*, comment 6 on N.J.R.E. 101(b)(1)(2000). The clear and convincing standard may be satisfied by uncorroborated testimonial evidence. *In re Seaman*, 133 *N.J.* 67, 84, 627 *A.2d* 106 (1993).

On the other hand, where removal of a Superior Court or municipal court judge is urged "for misconduct in office, willful neglect of duty, or other conduct evidencing unfitness for judicial office," *N.J.S.A.* 2B:2A–2, the reason for removal must be established beyond a reasonable doubt. *N.J.S.A.* 2B:2A–9; *In re Coruzzi*, 95 *N.J.* 557, 569, 472 *A.2d* 546 (1984). Reasonable doubt is defined as "an honest and reasonable uncertainty in [one's mind] about the guilt of the [accused] after [one has] given full and impartial consideration to all of the evidence. A reasonable doubt may arise from the evidence itself or from a lack of evidence. It is a doubt that a reasonable person hearing the same evidence would have." *State v. Medina*, 147 *N.J.* 43, 61, 685 *A.2d* 1242 (1996). The reasonable doubt standard also may be satisfied by uncorroborated testimonial evidence.

In judicial disciplinary proceedings, the effect of judicial misconduct on other persons is not an essential element of an alleged violation of a Canon of the Code of Judicial Conduct or the Court's Disciplinary Rules. The effect upon other persons, however, may be a relevant factor in assessing the gravity of the misconduct and the appropriate discipline. *In re Connor*, 124 *N.J.* 18, 26–27, 589 *A.2d* 1347 (1991).

## II.

Respondent was admitted to practice law in New Jersey in 1980 and has no prior disciplinary history. He became a Judge of the Municipal Court of the City of Passaic effective December 1, 1993, and has been reappointed to two successive three-year terms. He was a full-time judge by virtue of a local ordinance enacted pursuant to *N.J.S.A.* 2B:12–4a.

We are satisfied from our independent review of the record that the evidence demonstrates beyond a reasonable doubt that respondent engaged in a course of conduct evidencing unfitness for judicial office by abusing his authority as a judge. We conclude that respondent engaged in judicial misconduct spanning a period of approximately eighteen months that violated *N.J.S.A.* 2B:2A–2,

the Code of Judicial Conduct, and the Court's Disciplinary Rules. He should therefore be removed from his judicial office.

### A.

The first matter that we address arises out of a debt respondent owed to a privately owned and operated school, the Collegiate School in the City of Passaic, which his sons, Patrick and William, attended. Respondent shared a close relationship with the school for approximately twenty years and eventually became a member of its Board of Trustees.

Because of an illness and lack of insurance coverage prior to becoming a municipal court judge, respondent became delinquent in his payment of tuition and fees to the Collegiate School. As part of an agreement to conclude litigation over that indebtedness, respondent executed a promissory note for the balance owed to the school and agreed to liquidate that balance through install-ment payments; the last installment became due on May 1, 1998. Believing that respondent was delinquent in his payments, on July 3, 1996, John Lazor, Jr., President of the Board of Trustees of the Collegiate School, wrote to respondent and his wife "in reference to [their] financial obligation to [the] Collegiate School." Refer-ence was made to respondent's failure to make a payment under the agreement and to a "new" indebtedness. Lazor requested that "the matter be attended to immediately" and indicated that he would "seek legal [counsel]" if he did not hear from respondent and his wife "in the next few days."

Respondent's July 7, 1996 reply to that letter reads as follows:

WOLF SAMAY

[ ] PASSAIC AVENUE

PASSAIC, NEW JERSEY 07055

July 7, 1996

John Lazor, Jr., President

Board of Trustees

Collegiate School

Kent Court

Passaic, New Jersey 07055

Dear Mr. Lazor:

This letter is in response to your letter dated July 3, 1996. The substance of your letter attempts to address two separate instances of arrearages in tuition payments. Your letter also suggests the "way to correct this situation."

Firstly, regarding my "previous indebtedness," an agreement was reached in September of 1993 between Mr. Boscia and myself, with the consent of Dean Gibson, to pay off the arrearage no latter than May of 1998. I have paid on account of my indebtedness the approximate amount of $6,000.00, which payments represent approximately three (3) times the amount which I was required to pay under the agreement. The agreement is in full force and legally defensible. As to the "impression" that you had and as to what you knew or what you now know is of no significance and of little import. The agreement is being honored and legally stands on its own.

Furthermore, regarding my recent outstanding balance of $2,625.00, I promised Miss Ellie that I would pay in $1,000.00 increments for June, July, and August which would pay off the indebtedness before September. As promised, I made my payment for June. Consequently, your assertion that I failed to honor my promise is inaccurate.

I would like to emphacize [sic] at this point that your "suggestion" as to how I can resolve my problem is both simplistic and presumptuous. Please do not ever again take the liberty of advising me as to how I can resolve my problems. Neither by your age, by your occupation, by your life experiences or by your education are you qualified to do so.

Lastly, and most importantly, I intensely resent the tone of your letter. It is arrogant, overbearing, and totally unwarranted. Given my eighteen (18) year relationship with Collegiate School, as a long-standing member and immediate past president of the Board of Trustees and as an active parent, the format and tone by which you chose to communicate with me is egregiously offensive. Moreover, your threat that unless you hear from me in the next few days this $1,625.00 matter may be subject to legal action is unconscionable and ludicrous.

In conclusion, suffice it to say that your letter was highly inappropriate, in bad taste, and blatantly ignorant of the factual matrix of the last eighteen years.

Very truly yours,

[Signature]

Wolf Samay, Esq., JMC

Member of the Board of Trustees

P.S. To protect the image of Collegiate School, please have any future correspondence edited to correct your blatant sixth grade errors.

Respondent sent copies of that letter to Angela Gibson, the Headmaster at Collegiate School, and to other school officials. The aspect of respondent's letter that has disciplinary significance is the fact that respondent signed the letter as an attorney ("Esq.") and as a judge ("JMC"). Respondent testified that he used the "JMC" initials only to "impress" upon Lazor that respondent "had enough intelligence" to "make [his] own decisions" and "take care of [his] financial problems." Thus, respondent acknowledged using the "JMC" initials intentionally. Respondent also acknowledged knowing that utilization of the initials in a nonjudicial, personal letter was "[w]holly inappropriate." We find respondent's alleged motive for using the initials "JMC" totally lacking in credibility. *Cf. State v. Locurto*, 157 *N.J.* 463, 470–75, 724 *A.*2d 234 (1999) (discussing appellate review of witness credibility determinations).

## B.

Next, we consider the Jakubovic matter. In 1995, Susan Jakubovic Dauber (Susan), an attorney in New Jersey, and her husband Benjamin Jakubovic (Benni) were having marital difficulties. She obtained a temporary restraining order (TRO) against her husband, removing him from the marital home. In an apparent attempt to make Susan safer under the TRO, a search warrant was issued to seize several weapons belonging to Benni. The TRO and the search warrant were authorized by respondent. Thereafter, a dispute arose between Susan and Benni concerning an automobile that led to the filing of a complaint alleging theft. Respondent recused himself from presiding over any court proceeding regarding those two matters because he had a long-term relationship with Benni, who was a municipal official.

Benni was a Councilman in the City of Passaic during the pertinent period between December 1993 and July 1997. In that capacity, he signed a resolution confirming the mayor's initial appointment of respondent as a municipal court judge in 1993 and his reappointment resolution in 1996. He also signed an ordinance that provided a pay increase for respondent in February 1997. Prior to becoming a councilman, Benni and respondent had served together on the City of Passaic's Board of Adjustment for a number of years.

On July 14, 1997, Benni reported two incidents of domestic violence by Susan to the City of Passaic Police Department. He signed two harassment complaints alleging petty disorderly persons offenses. One alleged that on June 27 and 29, 1997, Susan harassed him by yelling at him, by calling him obscene names, and by using offensively coarse language causing him to be annoyed and alarmed, in violation of *N.J.S.A.* 2C:33-4. The second complaint alleged that on July 13, 1997 Susan committed an act of harassment "by calling [Benni's] residence at 6:00 a.m., two times hanging up the telephone when he answered," also in violation of *N.J.S.A.* 2C:33-4. Benni also signed a "New Jersey Domestic Violence Civil Complaint" based on the same conduct.

In response to those complaints, Lieutenant Robert Fulleman contacted respondent by telephone shortly after 11:00 p.m. that night. Although no recordation of that conversation was made to reflect the asserted basis for the probable cause requirement, it is undisputed that as a result of that conversation, respondent authorized a TRO, a search warrant, and an arrest of Susan pursuant to the petty disorderly persons offenses alleged in the complaint. It is undisputed that, not only was there no recordation of the communication between Lieutenant Fulleman and respondent, but no papers were ever presented to respondent, including a copy of the TRO or search warrant he authorized.

We agree with the hearing panel's findings of what occurred when the warrant was executed:

It is undisputed that, notwithstanding the fact that the police officers executing the search warrant on July 14, 1997 found no weapons, and notwithstanding the absence of any observable conduct that justified the arrest of Ms. Dauber at her home, she was arrested on the petty disorderly persons complaints at around midnight and taken to the police station where she was subsequently released on the R.O.R. set by respondent in his conversation with Fulleman. Susan returned home about three o'clock in the morning of July 15, 1997. Lieutenant Fulleman testified that respondent set the bail R.O.R. on a complaint-warrant or the complaint-warrants that had been signed by Benni before Fulleman's call to respondent.

Pursuant to directions received at police headquarters, [Susan] returned later on the morning of July 15, 1997 for a first appearance or arraignment on the petty disorderly persons complaints, which respondent conducted. After advising [Susan] of the charges against her and accepting pleas of not guilty, respondent indicated "I'm fixing your bail at $5,000. I'm releasing you R–O–R, and we'll notify you when to come back for trial." Thereafter [Susan] asked respondent if he intended "to hold the trial here" or to recuse himself, and respondent indicated that he would recuse himself, and "transfer" the case to another municipality, in light of his prior recusal in matters involving the parties.[1]

Respondent's position with respect to the Jakubovic matter is that he was aware when he received the telephone call from Lieutenant Fulleman that he should not take any action in a matter involving the councilman; however, he did so in this case because this situation was emergent in the sense that it involved domestic violence, and that there was an allegation of the presence of weapons in [Susan's] residence. He further asserts that he sat on her case on the morning of July 15, 1997 only because he was not aware that she would be in court that morning, that the appearance involved pro forma proceedings, and that the procedures followed in the Jakubovic case were no different than what ordinarily would occur in any other matter in the City of Passaic.

We first address the issue of the emergent nature of the telephone call made on July 14, 1997. It is the emergent nature of that telephone call and the situation described therein that prompted respondent to proceed with the matter notwithstanding his knowledge that he should recuse himself. However, while it is alleged that [Susan] used obscenities, neither Lieutenant Fulleman nor respondent asked, or knew at the time, specifically what the obscenities were. Nor was there any indication that any threats had been made by [Susan] against the victim. While

---

[1] The petty disorderly persons harassment charges were ultimately dismissed by the Family Part because the conduct was not violative of the statute as interpreted by *State v. Hoffman,* 149 *N.J.* 564, 695 *A.2d* 236 (1997).

there was some dispute in the facts, it seems clear that Benni Jakubovic did not advise Lieutenant Fulleman, nor did Lieutenant Fulleman advise respondent, that Benni was in any fear. In fact, the testimony indicates that Benni was leaving on vacation and Fulleman so advised respondent.

Moreover, although there was an allegation of the presence of two specific weapons in [Susan's] home, there was no attempt to have the complainant so swear under oath, incident to issuance of the search warrant or otherwise. In addition, the context of Lieutenant Fulleman's advice to respondent was that these weapons remained in the home after the incident in 1995 when the home was first searched for weapons on Susan's application, and there was no suggestion that Susan ever used or made a threat to use them. In view of the lack of circumstances that could be described as emergent, this panel is unable to conclude that respondent could not have advised Lieutenant Fulleman to call another judge to handle the matter. Furthermore, we question whether respondent perceived the matter as requiring emergent action, so that time could not be taken to call another judge, when he found that the circumstances justified the release of [Susan] R.O.R., irrespective of what the search warrant revealed.

. . . .

The police have authority to arrest for any criminal or non-indictable conduct they observe and could have arrested [Susan] for such conduct they observed in serving the TRO and executing the search warrant. *See R.* 3:4–1; *R.* 7:2. Note that separate Part VII was adopted effective February 1, 1998, after these events, and that *R.* 3:4–1 essentially governed the proceedings on non-indictables as well as the indictables the prior July. *See R.* 7:2; 7:3. We are cited to no portion or provision of the Domestic Violence Manuals respondent introduced which supports his contention that an arrest is required for a non-indictable petty disorderly persons harassment complaint when the complaint alleges or relates to a complaint alleging domestic violence. . . .

Whether or not respondent authorized [Susan's] arrest on the complaint-warrants signed by Benni Jakubovic, respondent initialed his finding of probable cause the next morning. He so acknowledged before us, and Denise Bradshaw, the Deputy Clerk who signed the warrants on the morning of July 15, without making a finding of probable cause, testified that respondent added those initials during the arraignment. As the determination of probable cause was not made on the record during the arraignment, respondent's recordation of the probable cause determination is evidence which supports a finding that he authorized the arrest the night before.

In any event, it appears that respondent knew on the evening of July 14, 1997, that [Susan] would be arrested and that the arrest would take place that night. Fulleman testified that he asked respondent to set the bail during his conversation with respondent in case the police were "able to serve this tonight." And the bail-

R.O.R. was set at that time. We conclude, based upon all of the evidence, that respondent authorized the arrest of [Susan] on July 14, 1997, and had a strong belief that her arrest would occur that night.

Despite respondent's clear awareness that he should have recused himself from the entire Jakubovic July 14–15, 1997 matter, his failure to do so set in motion a set of anticipated events that led to Susan's arrest late at night while her children were sleeping. Her house was searched, and she was required to appear before respondent on the morning of July 15, 1997.

## C.

The third matter involves the arrest of Patrick's gym teacher, David Grassie, concerning an incident at the Collegiate School on November 6, 1997. Patrick was playing basketball in a gym class when he was observed by his gym teacher hanging on the basketball rim while attempting to dunk the ball. Because Patrick had previously broken his arm dunking the basketball in a gym class in January 1997, Grassie directed Patrick not to hang on the rim. That prompted a verbal confrontation between Patrick and Grassie that resulted in a conference the next morning with the Headmaster, respondent, his wife, Patrick, Grassie, and a few other student-witnesses. Although nothing mutually satisfactory was achieved at the November 7, 1997 conference, respondent did not report the incident to the police for more than a week.

On November 11, 1997, respondent called the Headmaster at Collegiate stating that unless Grassie was terminated within three days, respondent would bring criminal charges against Grassie. Respondent reported the matter to the City of Passaic Police Department on November 18, 1997. As a first step toward having Grassie arrested, respondent arranged to have an incident report made out by a police officer, stating that respondent reported that on November 6, 1997, his son Patrick informed him that David

Grassie had threatened to slap him, made verbal assaults toward him, and threatened to "bash Patrick's head in and kill him" after a gym class. Patrick denied that he ever told his father that Grassie threatened to bash his head in or kill him.

The incident report was delivered to Detective Andrew White at the City of Passaic Police Department. That detective interviewed Patrick with respondent's permission. Patrick informed the detective that Grassie threatened to slap him and to cause him bodily harm. He denied that Grassie threatened to bash in his head or to kill him. Detective White prepared a complaint and warrant charging Grassie with third-degree terroristic threats, in violation of *N.J.S.A.* 2C:12–3a. Significantly, Detective White did not sign the complaint, but instead notified respondent that it was ready for respondent's signature. Respondent went to the Police Department and signed the complaint and warrant knowing that Grassie would be arrested and brought before the City of Passaic Municipal Court. Detective White arranged to have a municipal court judge in Paterson set the bail before taking Grassie into custody. That judge fixed the bail at $2,500 R.O.R. Grassie was arrested at the school on November 21, 1997, at approximately 3:58 p.m. by Officer Steven Tobias of the City of Passaic Police Department. Grassie was fingerprinted and placed in a jail cell where he remained for approximately one hour before his release. As it turned out, the arrest was made without a proper warrant because the warrant was not duly authorized by a judicial officer until it was signed on November 24, 1997, by Dolores Bradshaw, then Deputy Court Clerk of the Passaic Municipal Court.

We find that respondent's assertions that he informed the police of the incident because of his concern as a parent for the safety of students at the Collegiate School and that he signed the complaint against Grassie only because Detective White advised him that a parent must sign a complaint when a child is the victim, totally lack credibility. He signed the complaint for revenge; indeed he admitted as much.

We have no doubt that respondent knew that filing the incident report would set in motion a chain of events that would lead to the arrest of David Grassie and Grassie's appearance in the municipal court in which respondent was the only judge. As expected, Grassie appeared before respondent on November 24, 1997, with counsel, for arraignment in the Passaic Municipal Court. On that morning, after counsel entered his appearance and noted that "the Court is the complainant," respondent answered "I am the complainant in my individual capacity" as if that would somehow purify the contaminated judicial atmosphere. Counsel then stated "I do not see how the Court can handle any aspect of the – of the proceedings" and respondent replied "I am not, sir. What I am doing is I'm basically advising Mr. Grassie of the charges, which you have." Thereafter, respondent accepted a waiver of the reading of the charges and advised defendant Grassie to report for a pre-indictment processing hearing in the Law Division. Respondent also noted that if the matter was remanded back to a municipal court for disposition, "it will be referred ... to a different municipal court, probably out of the county." Respondent also indicated that bail had already been set and that he was "just informing [Grassie] of the charges and somebody has to do it, nobody else is available. I'm doing it." Although Grassie was charged with a third-degree offense, the matter ultimately was remanded to another municipal court where Grassie was acquitted of all charges.

Even assuming that, notwithstanding the substantial contrary evidence, respondent first became aware that the complaint he had filed against Grassie was on respondent's court docket when the case was called on the morning of November 24, 1997, clearly respondent knew Grassie by name and what he looked like. Grassie had taught both of his sons, and respondent had just met with Grassie at a conference on November 7, 1997. Although there was only a brief colloquy between respondent and Grassie's counsel during the arraignment before counsel raised the issue of conflict, respondent should have immediately indicated that he would not preside in any manner over any aspect of the Grassie

matter. Respondent should have recused himself at the outset of the colloquy, and he should have done so *sua sponte*, without forcing Grassie to make an appearance before his judicially-robed accuser.

## III.

We agree with the hearing panel, and so find, that respondent's letter dated July 7, 1996, addressed to John Lazor, Jr., violated Canons 1, 2A, and 2B of the Code of Judicial Conduct. Canon 1 requires judges to "uphold the integrity and independence of the judiciary." Canon 2A states that "[a] judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Canon 2B, in pertinent part, provides "[a] judge should not lend the prestige of office to advance the private interests of others." We also agree with the hearing panel, and so find, that respondent violated Disciplinary *Rule* 2:15–8(a)(6) in that his purposeful and intentional use of the initials "J.M.C." in the letter to Lazor constituted "conduct prejudicial to the administration of justice that bring[s] the judicial office into disrepute." Although it was inappropriate for respondent to have intentionally misused the initials "J.M.C." for his personal gain, a misuse that inevitably diminishes the public confidence in the judicial office, we do not find that removal is warranted based on that judicial misconduct alone. When viewed in isolation, it warrants discipline short of removal. Here, however, that misconduct will be considered as part-and-parcel of respondent's larger pattern of judicial misconduct.

"[T]he most significant goal of judicial removal statutes is the preservation of the public's confidence in the judicial system." *In re Coruzzi*, 95 *N.J.* 557, 571–72, 472 *A.*2d 546 (1984).

The focus of a removal proceeding is determined solely by the public interest, *In re Yaccarino*, 101 *N.J.* 342, 396, 502 *A.2d* 3 (1985), and by the Court's "steadfast commitment to maintaining an independent and incorruptible judiciary." *In re Imbriani*, 139 *N.J.* 262, 266, 652 *A.2d* 1222 (1995). Public confidence in the judiciary "is shaken when a judge commits an offense [or conduct] that subjects him or her to removal; the removal proceedings are designed to restore faith." *In re Coruzzi, supra,* 95 *N.J.* at 572, 472 *A.2d* 546. By applying that standard to the Jakubovic and Grassie matters, we conclude that respondent knowingly and purposely violated Canons 1, 2A, and 3C(1), as well as *Rule* 2:15–8(a)(6) in the Jakubovic matter, and Canons 1, 2A, 2B, and 3C, as well as *Rule* 2:15–8(a)(6) in the Grassie matter, thereby requiring removal.

■ Clearly respondent, as required by Canon 3C, should have disqualified himself from sitting in any phase of the Jakubovic and Grassie matters. Canon 3C(1) requires a judge to disqualify himself or herself in any "proceeding in which the judge's impartiality might reasonably be questioned." Respondent issued a TRO and a search and arrest warrant for the wife of a councilman based on two suspicious domestic violence complaints despite a clear conflict of interest based on his relationship with the councilman. Even if the complaints were credible, no arrest warrant should have been authorized for the alleged petty disorderly persons offenses. There was nothing in the circumstances that removed this case from the well-established rule requiring a complaint for a petty disorderly persons offense to be prepared on a complaint-summons form without an arrest warrant. *R.* 3:3–1(c); *R.* 3:4–1(a)(1); *R.* 7:2–1; *R.* 7:2–2(b). Notwithstanding the obvious conflict of interest, previously recognized by respondent in 1995 when Susan filed a similar complaint against Benni, respondent presided over the arraignment of the complaints against the councilman's estranged wife. Four months later, after vindictively

filing criminal charges against his son's gym teacher and having him arrested, respondent presided over the teacher's arraignment, despite his knowledge that doing so constituted judicial misconduct. The evidence established beyond a reasonable doubt that respondent corrupted his judicial office to benefit his personal interest and to punish people for personal reasons.

When respondent gave false and misleading information to the police in the Grassie incident report and was less than truthful in his testimony before the ACJC and the hearing panel, he demonstrated a lack of respect for the law. Equally aggravating is the fact that respondent's motive in both the Jakubovic and Grassie matters was venality and corruption of justice to advance his personal interest. Respondent's actions in both cases had the clear capacity to undermine the proper administration of justice.

When respondent became a judge, he took an oath to "faithfully, impartially and justly perform all the duties" of judicial office. *N.J.S.A.* 41:1–3. Upon assuming that office, he was invested with many powers. "No power is greater, nor its responsibilities more awesome, than that given a judge." *In re Coruzzi, supra,* 95 *N.J.* at 563, 472 *A.2d* 546. That awesome power is bestowed upon a judge on the condition that the judge not abuse or misuse it to further a personal objective such as a vendetta or to help a friend. Respondent not only abused that power, but he betrayed the public trust and New Jersey's great tradition of judicial honesty and integrity. The polestar of our Canons of Judicial Conduct is to maintain judicial integrity and the public's confidence in that integrity. *In re Seaman, supra,* 133 *N.J.* at 96, 627 *A.2d* 106.

Municipal courts are critical to our judicial system. More cases are processed annually through those courts than any other branch of the judicial system. The large number of litigants who appear in those courts daily make it all the more important for the judges who serve in those courts to act responsibly and be sensitive to the public perception of their actions. It is the court

of first and last resort for many, and for that reason, those courts are responsible "for the popular image of the entire system." *In re Mattera*, 34 *N.J.* 259, 275, 168 *A.2d* 38 (1961); *In re Yengo*, 72 *N.J.* 425, 433–34, 371 *A.2d* 41 (1977). Although disposing of traffic violations or violations of noise ordinances may not attract as much attention as the trial of a famous murder case, "the corruption of judicial administration of a Municipal Court is of paramount importance. Such conduct, visible and apparent to the community, destroys the trust and confidence in our institutions upon which our entire governmental structure is predicated." *In re Spitalnick*, 63 *N.J.* 429, 432, 308 *A.2d* 1 (1973).

■ Respondent has urged us to impose a discipline short of removal. To support that claim, he relies on *In re Carton*, 140 *N.J.* 330, 341–42, 658 *A.2d* 1211 (1995); *In re Fenster*, 138 *N.J.* 134, 649 *A.2d* 393 (1994); *In re Seaman, supra*, 133 *N.J.* 67, 627 *A.2d* 106; *In re Santini*, 126 *N.J.* 291, 597 *A.2d* 1388 (1991); and *In re Murray*, 92 *N.J.* 567, 458 *A.2d* 116 (1983). Those cases are distinguishable from the present case because none of those cases came before the Court in a removal proceeding. They were before the Court for imposition of a sanction primarily in the form of a reprimand for acts of wrongdoing outside the scope of the performance of judicial duties. The present case is similar to cases such as *In re Hardt*, 72 *N.J.* 160, 168, 369 *A.2d* 5 (1977), and *In re Yengo*, supra, 72 *N.J.* at 451, 371 *A.2d* 41, where the judge was removed from office based on misuse of judicial office in the performance of judicial duties. Respondent's conduct was far more serious than the judicial misconduct in the cases he has cited. Indeed, respondent's misconduct "did violence to the fundamental principle of disinterested justice which is the bulwark of our judicial system.... We must guard not only against the spectacle of justice corrupted in one instance, but against the subversion of confidence in the system itself. A community

without certainty in the true administration of justice is a community without justice." *In re Spitalnick, supra*, 63 *N.J.* at 431–32, 308 *A.2d* 1.

It is also disturbing that respondent minimizes his misconduct and has demonstrated that he has no compunction about being less than credible in support of his position. We deem that shortcoming to be further evidence that respondent lacks the honor and integrity demanded of a judge. Because respondent's transgressions in the Jakubovic and Grassie matters " 'directly subvert[ed] and corrupt[ed] the administration of justice,' " respondent has "poisoned the well of justice." *In re Pena*, 164 *N.J.* 222, 234, 753 *A.2d* 633 (2000) (quoting *In re Verdiramo*, 96 *N.J.* 183, 186, 475 *A.2d* 45 (1984)).

The record in this case establishes beyond a reasonable doubt that respondent was "intoxicat[ed] with judicial power which . . . is a wholly unacceptable syndrome that cannot be tolerated in New Jersey courts." *In re Yengo, supra*, 72 *N.J.* at 450, 371 *A.2d* 41. The record satisfies us beyond a reasonable doubt that respondent did not recuse himself in the Jakubovic matter from issuing a search and arrest warrant or presiding over the arraignment so that he could benefit his long-term colleague in municipal government. Even more egregious was his vendetta motive on having Grassie arrested and then arraigned before him.

Respondent's conduct as a judge cannot be tolerated. We find beyond a reasonable doubt that there is cause for removal based on "unfitness for judicial office." *N.J.S.A.* 2B:2A–2. He is herewith ordered removed forthwith as a Judge of the Municipal Court of the City of Passaic.

*For removal*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO and LaVECCHIA—6

*Opposed*—None.

## ORDER

**JUDGE WOLF A. SAMAY** of the Municipal Court of the City of Passaic, having been ordered to show cause why he should not be removed from judicial office or otherwise disciplined, and good cause appearing;

It is **ORDERED** that **JUDGE WOLF A. SAMAY** is hereby removed from judicial office, effective immediately.