73 A.3d 1244

IN THE MATTER OF ADVISORY LETTER NO. 3–11 AND OPIN-
ION NO. 12–08 OF THE SUPREME COURT ADVISORY
COMMITTEE ON EXTRAJUDICIAL ACTIVITIES.

Argued February 26, 2013—Decided September 19, 2013.

*E. Drew Britcher* argued the cause for appellant Vincent A. Sicari, J.M.C. (*Britcher, Leone & Roth*, attorneys; *Mr. Britcher* and *Mindy M. Roth*, on the letter briefs).

*Kim D. Ringler*, Deputy Attorney General, argued the cause for respondent Supreme Court Advisory Committee on Extrajudicial Activities (*Jeffrey S. Chiesa*, Attorney General of New Jersey, attorney).

PER CURIAM.

This appeal explores the limitations on extrajudicial activities of judges. A part-time municipal court judge has been advised by the Advisory Committee on Extrajudicial Activities (Advisory Committee or Committee) that his judicial position and his acting

and comedy career are not compatible with the *Code of Judicial Conduct* (*Code of Judicial Conduct* or *Code* ).

A sitting municipal court judge received a request from a newspaper of general circulation to interview him following his appointment. The newspaper had contacted him for a follow-up article to a June 2007 piece describing the judge's pre-appointment legal and entertainment careers. The judge sought guidance from several sources, including the presiding municipal court judge in Bergen County and the Advisory Committee. That inquiry eventually led to advice that the judge should decline the interview and that his judicial position and his acting and comedy career were incompatible with the *Code of Judicial Conduct*. It is that advice from the Advisory Committee and two subsequent opinions issued by that committee that form the basis of this appeal.

## I.

Vincenzo August Sicari commenced law school in New York City in 1992. At the same time, he began writing screenplays and situation comedy routines. Following graduation from law school, Sicari completed a trial court clerkship, was admitted to the practice of law in this State in 1996,[1] and enrolled in acting classes. Since then, he has attempted to simultaneously develop his legal career and his entertainment career. To that end, he became an associate at two law firms between 1997 and 1999, formed a firm with another attorney for one year, and formed a law firm as a solo practitioner in July 2000. His practice is limited to plaintiff personal injury litigation, general commercial matters, and land-lord-tenant disputes and other Special Civil Part cases. At the same time, Sicari pursued his entertainment career, appearing in television pilot episodes, films, and commercials. By June 1997,

---

[1] He was also admitted to the practice of law in New York in 1997 and in the District of Columbia in 1998.

he appeared regularly as a stand-up comedian at a noted comedy club in New York City.

Sicari maintains that he has carefully separated his legal and comedic identities. He practices law as Vince A. Sicari;[2] he performs under the name Vince August. He claims very few people knew of his dual careers. In June 2007, however, the *Bergen Record* published a story about him entitled, "Lawyer by Day, Comic by Night—Ridgewood resident a Superman of sorts," which revealed that he maintained both a law practice and a career as a comedian. Sicari stated in the article that he "refuse[s] to do a law joke."

In December 2007, the mayor-elect of South Hackensack contacted Sicari to discuss his appointment as a municipal court judge. He immediately met with the mayor-elect and township attorney to disclose his entertainment career. Sicari assured the mayor he had always kept his legal and entertainment careers separate, never mentioned law or the practice of law in his routines, and had no intention of altering that course. He took the oath of office as a municipal court judge and commenced his judicial duties in January 2008. He serves in a part-time position with an annual salary of $13,000.

Following his appointment, the *Bergen Record* requested a follow-up interview. In response to that request, Sicari placed a call to the counsel to the Advisory Committee. During that conversation, he provided a detailed description of his activities as a comedian, including the nature of his comedy routines and the locations of his performances. Sicari noted that he appears exclusively in New York and California with the exception of a single annual appearance at a fundraiser at a comedy club in Bergen County. Sicari stated that he performs at a club in New York City on Sunday through Thursday nights doing improvisational comedy. On Friday and Saturday nights, he appears at

---

[2] The Central Attorney Management System and Lawyers' Diary list him as Vincenzo A. Sicari.

another club doing stand-up comedy routines in which his material is mostly self-deprecating and often based on his experience growing up as an Italian–American Catholic. He also disclosed that the general topics of his routines include religion and personal sexual experiences.

In a letter dated approximately three weeks later, Sicari provided additional information about his dual careers. He disclosed that he appears on nationally syndicated radio shows as "Vince August" and discusses a variety of topics, including pop culture, religion, politics, and sports. He also revealed that he has appeared and anticipated further appearances in various television shows, films, commercials, and corporate videos. He stated that he has never referred to his legal career or his judicial position while entertaining.

Based on that information, the Advisory Committee issued Opinion No. 12–08. The opinion reminded Sicari that the Advisory Committee provides advice only but informed him that his entertainment activities were not compatible with his judicial position. It stated:

> The Advisory Committee, via telephone poll, has determined that (1) you may not continue to perform as a comedian/entertainer while serving as a part-time municipal court judge, (2) you may not be interviewed by the *Bergen Record* about your profession as a comedian/entertainer while serving as a municipal court judge or be observed by a reporter for the *Bergen Record* while sitting on the bench, and (3) you may not engage in charity work as a performer at fundraisers while serving as a part-time municipal court judge.

Following advice from the Assignment Judge that he cease his entertainment career while serving as a municipal court judge and that he refuse the interview with the newspaper, Judge Sicari sought reconsideration of Opinion No. 12–08.

In his letter requesting reconsideration, Sicari stated that the only issue before the Advisory Committee was "Can I continue to sit as a municipal court judge while actively engaged in an entertainment career which provides a substantial part of my income?" In a letter dated May 6, 2010, the Advisory Committee ratified its earlier advice to him. The Committee's letter conclud-

ed with the admonition that he "should not continue to perform in a paid capacity as a comedian/entertainer."

After this Court granted Sicari's petition for review, the Advisory Committee issued another letter, which outlined seven factors that influenced its decision. Those factors included the revelation of Judge Sicari's stage name and coordinate career in the June 2007 newspaper article, congratulatory messages from some lawyers and judges after publication of the article, the continuing interest of the newspaper in his dual careers, the mention of his legal practice but not his judicial position on his Vince August website, the subject matter of his comedy, the number of appearances on a yearly basis and the national nature of his exposure, and the time he devotes to and the income he derives from his entertainment career.

Thereafter, Sicari informed the Advisory Committee of his involvement in *What Would You Do?*, a reality television show, and inquired whether his participation in that show was permissible. He described the television show as

a social experiment series in which actors play out real life scenarios in public places in order to capture the reaction of members of the public and whether they will come to the aid and/or intervene where a stranger is concerned. The actors in the show are provided a script. There are no credits for the show and no names of the actors are used or displayed. Only when the public's reaction becomes heated does the show[']s host, John Quinones, come forward, flanked by cameramen to reveal the show[']s intent.

The Advisory Committee issued Advisory Letter No. 3-11. It advised Sicari that his participation in the show could create an appearance of impropriety. The Advisory Committee expressed its concern that viewers might recognize him as a sitting municipal court judge. It cited the Vince August website, his LinkedIn profile, and the identification of Vince August as a cast member of the show. The Advisory Committee expressed concern that if a member of the public made the association between Vince August and Judge Sicari, then he or she might believe that Judge Sicari shares the same views as the characters he portrays. If that occurred, the Advisory Committee feared this association "would likely create a perception of bias, predisposition, a lack of impar-

tiality, and risk 'impairing the dignity and esteem in which the court should be held.'" This Court also granted Sicari's petition to review Advisory Letter No. 3–11. 208 *N.J.* 365, 29 *A.*3d 739 (2011).

Pending our review, Judge Sicari continues to perform as a comedian/entertainer appearing under the name of Vince August, although he has "taken down" his website. He continues to derive a significant portion of his income from his entertainment career. He also continues to serve as a municipal court judge.

## II.

Before us, Sicari argues that he should be allowed to simultaneously pursue a career as an entertainer and serve as a municipal court judge. He contends that he has maintained the integrity and professionalism of the judiciary and has made every effort to keep his identities separate. He also argues the Advisory Committee should have conducted an evidentiary hearing to permit him to develop a factual record.

The Advisory Committee expresses skepticism about Judge Sicari's ability to maintain the professionalism and dignity of the proceedings in his court if he continues his acting and comedic career. The Advisory Committee relies on Canon 5A of the *Code of Judicial Conduct* and prior advisory opinions. It emphasizes that the nature of Sicari's comedy routines is often based on self-deprecating remarks centered on religion, his personal experiences, family life, and observations. The Advisory Committee also questions Sicari's ability to keep his judicial and entertainment careers separate given the continuing interest of a newspaper of wide circulation and his biography on his Vince August website in which he referred to his legal career.

## III.

### A.

Recently, we commented on the critical role of the municipal courts in our justice system and the necessity for municipal court

judges to conduct their public and private lives in a manner to preserve the integrity of the municipal courts and the impartiality of the proceedings in those courts. *In re Advisory Letter No. 7–11 of the Supreme Court Advisory Comm. on Extrajudicial Activities*, 213 *N.J.* 63, 61 *A*.3d 136 (2013). We said:

> Each year, the only experience that millions of New Jersey residents and non-residents will have with our judicial system will be in our municipal courts. *State v. McCabe*, 201 *N.J.* 34, 42 [987 *A*.2d 567] (2010) (citing *In re Mattera*, 34 *N.J.* 259, 275 [168 *A*.2d 38] (1961)). Because for most members of the public, municipal court "is the court of first and last resort," *In re Samay*, 166 *N.J.* 25, 43–44 [764 *A*.2d 398] (2001), "municipal court judges are the face of the Judiciary," *McCabe, supra*, 201 *N.J.* at 42 [987 *A*.2d 567]. The public will pass judgment on our entire justice system based primarily on their impressions of the judges who preside in our municipal courts. *See ibid.* Certainly, the public will lose faith in our justice system if it believes that judges are hearing cases despite conflicting interests that strain their ability to be impartial. The mere appearance of bias in a judge— however difficult, if not impossible, to quantify—is sufficient to erode respect for the judiciary. *See DeNike v. Cupo*, 196 *N.J.* 502, 514 [958 *A*.2d 446] (2008). To that end, judges must "'refrain ... from sitting in any causes where their objectivity and impartiality may fairly be brought into question.'" *Ibid.* (quoting *State v. Deutsch*, 34 *N.J.* 190, 206 [168 *A*.2d 12] (1961)).
>
> Therefore, "ensuring both conflict-free, fair hearings and the appearance of impartiality in municipal court is vital" to maintaining public confidence in our system of justice. *McCabe, supra*, 201 *N.J.* at 42 [987 *A*.2d 567]. To accomplish that goal, we have in place exacting standards of judicial conduct to which we now turn.
>
> [*Id.* at 70–71, 61 *A*.3d 136 (alteration in original).]

To that end, judges who serve on the municipal court, even those who serve in part-time positions and have other professional or non-professional activities and sources of income, are governed by the *Code of Judicial Conduct. Id.* at 71, 61 *A*.3d 136; *In re Samay, supra*, 166 *N.J.* at 43–44, 764 *A*.2d 398.

The Court adopted the *Code of Judicial Conduct*, which was based on the American Bar Association's model Code of Conduct, in 1974. *In re Application of Gaulkin*, 69 *N.J.* 185, 195–96, 351 *A*.2d 740 (1976). The *Code* consists of seven canons that "provide guidance on the manner in which judges are to comport themselves." *In re Seaman*, 133 *N.J.* 67, 96, 627 *A*.2d 106 (1993). Those canons "direct each judge in conducting himself or herself in office, and guide the Court in determining when judicial miscon-

duct occurred." *Id.* at 95, 627 *A.*2d 106. Although the canons are "rules to be enforced," they "also exhibit an aspirational and hortatory character." *Ibid.* This Court has noted that

> [b]ecause of that, the behaviors encompassed by each canon are not separable into rigid and distinct categories. Nevertheless, the canons are not mere platitudes. They direct each judge in conducting himself or herself in office, and guide the Court in determining when judicial misconduct has occurred. The ultimate and permeating objective of the canons, however, is to maintain the integrity of the judiciary and public confidence in that integrity. Accordingly, the canons evidence concern not only for the reality of judicial integrity, but for the appearance of that reality.
>
> [*Id.* at 95–96, 627 *A.*2d 106 (citing Pressler, *Current N.J. Court Rules,* commentary on *Canons* 1 and 2 (1993)).]

This Court adopted the *Guidelines for Extrajudicial Activities* (*Guidelines*) in 1987. They are intended to implement, not to supplant or modify the *Code of Judicial Conduct. Report of the Supreme Court Committee on Extrajudicial Activities,* 117 *N.J.L.J.* 367 (Mar. 20, 1986) (*Report*). The *Guidelines* are available to all judges at www.judiciary.state.nj.us/ann.pdf. The *Guidelines* were not written to anticipate and address every conceivable conflict that could arise but were instead designed to enable judges to evaluate the appropriateness of their conduct under the *Code. Report, supra,* 117 *N.J.L.J.* at 367.

*Canon* 1 of the *Code of Judicial Conduct* is a "bedrock principle" that sets forth the underlying framework of a judge's ethical requirements. *DeNike, supra,* 196 *N.J.* at 514, 958 *A.*2d 446. The canon requires judges to "uphold the integrity and independence of the judiciary" and to adhere to "high standards of conduct." *Code of Judicial Conduct, Canon* 1; *see also DeNike, supra,* 196 *N.J.* at 522, 958 *A.*2d 446 ("[T]he standard of judicial conduct is necessarily high so that the integrity and independence of the judiciary may be preserved." (internal quotation marks omitted)).

*Canon* 2 of the *Code of Judicial Conduct* requires judges to "avoid impropriety and the appearance of impropriety in all activities." To achieve that goal, judges must "respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judicia-

ry." *Code of Judicial Conduct, Canon* 2A. Given that judges "must expect to be the subject of constant public scrutiny[,]" judges must "freely and willingly" "accept restrictions on personal conduct that might be viewed as burdensome by the ordinary citizen." Pressler & Verniero, *Current N.J. Court Rules*, commentary on *Canons* 1 and 2 (2013); *see also In re Blackman*, 124 *N.J.* 547, 551, 591 *A.*2d 1339 (1991) ("[J]udges have responsibilities with regard to their personal conduct that greatly exceed those of ordinary citizens.").

To effectuate *Canon* 2, the *Guidelines* direct judges to "always guard against the appearance of bias or partiality or the perception of prejudgment of issues likely to come before them," *Guideline* II.B, and to not risk "subjecting themselves to improper influence or the appearance of being so subjected," *Guideline* II.C.1.

*Canon* 5 requires judges to conduct any extrajudicial activities in a manner to avoid "cast[ing] reasonable doubt on the judge's capacity to act impartially as a judge[,]" "demean[ing] the judicial office[,] or" "interfer[ing] with the proper performance of judicial duties." *Code of Judicial Conduct, Canon* 5. Specifically, *Canon* 5 states:

A Judge Shall so Conduct the Judge's Extra–Judicial Activities as to Minimize the Risk of Conflict with Judicial Obligations

A. Extra-Judicial Activities in General.

A judge shall conduct all of the judge's extra-judicial activities so that they do not:

(1) cast reasonable doubt on the judge's capacity to act impartially as a judge;

(2) demean the judicial office; or

(3) interfere with the proper performance of judicial duties.

[*Ibid.*]

As the commentary notes, "[c]omplete separation of a judge from extra-judicial activities is neither possible nor wise; a judge should not become isolated from the community in which the judge lives." *Code of Judicial Conduct, supra,* commentary on *Canon* 5A. Nonetheless, the commentary notes "[e]xpressions of bias or prejudice by a judge, even outside the judge's judicial activities,

may cast reasonable doubt on the judge's capacity to act impartially as a judge." *Ibid.* Such expressions can include "jokes or other remarks demeaning individuals on the basis of their race, sex, religion, national origin, disability, age, sexual orientation or socioeconomic status." *Ibid.*

### B.

The Committee on Extrajudicial Activities was appointed by Chief Justice Wilentz to "undertake a comprehensive study of permissible activities" outside of the judicial function that New Jersey judges may pursue. *Report, supra,* 117 *N.J.L.J.* at 367, 370. In its 1986 *Report,* the Committee on Extrajudicial Activities proposed establishing an advisory committee that could resolve requests for guidance in circumstances where the *Code* and the *Guidelines* were not clear. *Ibid.* The "primary function would be to advise judges and the Supreme Court regarding the interpretation of the Canons and Guidelines to matters of extrajudicial activities." *Id.* at 370. The Advisory Committee was created pursuant to *Rule* 1.18A, which was adopted on November 29, 1988.

The Advisory Committee consists of members appointed by this Court. *R.* 1:18A–1. A majority is required for the Committee to dispose of an inquiry. *R.* 1:18A–4. A judge may petition this Court to review the Committee's disposition. *R.* 1:18A–7. The record on review of a Committee's disposition includes the Committee's response to the inquiry, the inquiry or memorandum submitted to the Committee, and any documents the Committee relied upon in reaching its determination. *R.* 1:18A–7(b).

The Advisory Committee provides guidance to judges through direct inquiries, as in this case, and also through an annotated booklet. The booklet catalogues a summary of opinions issued by the Advisory Committee. *See In the Matter of Advisory Letter No. 7–11, supra,* 213 *N.J.* at 74–75, 61 *A.*3d 136 (discussing sources of guidance for judges to assist in compliance with Canons of Judicial Conduct).

## IV.

This case presents the first opportunity for this Court to address whether the appearances by a sitting municipal court judge in comedy clubs, commercial videos, and regular television appearances contravene the *Code of Judicial Conduct*, specifically *Canon* 5. We have had the occasion to review a situation where a sitting municipal court judge made regular appearances on commercial television programs to discuss cases pending in other jurisdictions. *In re Broadbelt*, 146 *N.J.* 501, 505, 683 *A.2d* 543 (1996), *cert. denied*, 520 *U.S.* 1118, 117 *S.Ct.* 1251, 137 *L.Ed.2d* 332 (1997). In that case, we determined that the appearance violated *Canon* 3A(8)—prohibiting comment about pending or impending matters in any court—and *Canon* 2B—directing judges to avoid impropriety and the appearance of impropriety in all activities. *Id.* at 511, 512, 683 *A.2d* 543. Addressing the possibility that other judges might be invited to appear on a televised program, this Court noted that it could not envision every circumstance in which an appearance might occur and suggested that a limited appearance on public television might be consistent with the canons. *Id.* at 515, 683 *A.2d* 543. We stated:

> Not every television appearance by a judge on commercial television will be improper, or will create the appearance of impropriety. For example, it might be permissible for a municipal court judge to make an isolated appearance on public television to comment on the role of municipal court judges in the judiciary. Similarly, a one-time appearance by a Superior Court judge on a commercial television program dealing with the benefits and disadvantages of televising civil trials might be permissible. However, a judge's regular weekly appearance on a television program, whether the program was commercial or non-commercial, to comment on recent court decisions in New Jersey clearly would be improper. [*Ibid.*]

This Court did not address the applicability of *Canon* 5A to those appearances at that time.

The Advisory Committee, however, has released several opinions regarding extrajudicial activities of judges in which it applied *Canon* 5. In Opinion No. 22–02, the Advisory Committee advised a municipal court judge that he should not appear in a pilot for a cable television series. The judge only would have appeared in

the back of the courtroom as one of many spectators. He would not have been identified or have had a speaking role. Finding that the scene in which he would have appeared lacked appropriate decorum, the Advisory Committee counseled the judge that his appearance would be inconsistent with *Canon* 5. Similarly, in Opinion No. 5–91, the Advisory Committee advised a municipal court judge that he should not appear in a commercial for a nationally marketed brand of cereal.

In contrast, in Opinion No. 27–03, a Superior Court judge was permitted to be a member of a professional musical group provided his performance did not detract from the dignity of his office or interfere with his judicial duties. The Advisory Committee also advised the judge that he could not receive any compensation for his participation.

## V.

This Court conducts a de novo review of advice rendered by the Advisory Committee under the clear and convincing standard. *In re Mathesius,* 188 *N.J.* 496, 518, 910 *A.*2d 594 (2006). We construe the canons and the *Guidelines* broadly, *In re Boggia,* 203 *N.J.* 1, 10, 998 *A.*2d 949 (2010), and conduct our review for "the sole purpose of preserving public confidence in the integrity and independence of the judiciary[,]" *In re Mathesius, supra,* 188 *N.J.* at 518, 910 *A.*2d 594. In order to address the compatibility of Judge Sicari's entertainment career and activities with his ethical responsibilities as a judge, we must consider the various venues and modes in which he pursues his entertainment career.

### A. *What Would You Do?*

*What Would You Do?* is broadcast weekly by ABC News. It is described by the judge's attorney as "a social experiment series in which actors play out real life scenarios in public places in order to capture the reaction of members of the public and whether they will come to the aid and/or intervene where a stranger is concerned." The actors are provided a script, and the names of the

actors are not used or displayed when the episode is initially aired. Participants have been identified in some instances after the initial broadcast. For example, the network website identified a character who harassed gay men in a bar as Vince August. Judge Sicari, as Vince August, has appeared in at least seventeen episodes, two of which, *What Would You Do?: A Black Dad With a White Child Being Harassed* and *Shopping While Black,* have been identified by ABC News as fan favorites. Many episodes, particularly those identified as fan favorites, have been repeated and are available on the series' website and on YouTube. ABC News also distributes summaries of individual programs. In the summary of *Gay Bashing at a Sports Bar,* Vince August is identified as the actor hired to play the homophobic patron.

Sicari provided a summary of each episode as well as his respective role in each one. According to him, he played a security guard who engaged in racial profiling in *Shopping While Black.* According to Sicari, the episode was designed to "heighten awareness of stores that practice profiling of their customers." In *Gay Bashing,* Sicari played the role of a homophobic bar patron attempting to sway customers against having gay men in a "straight" bar. Sicari stated the episode was designed to heighten awareness of hate crimes. In *Gays in the Military,* Sicari played the role of a patron in a diner who reacted negatively to uniformed gay service members who publicly showed affection. The episode was designed to determine whether patrons would align with the service members or Sicari's character.

In *Lost Tire,* Sicari played the part of a security guard investigating a lost tire found in the parking lot. The episode was designed as a spoof of news agencies sensationalizing ordinary events of daily life. Two episodes entitled *Bikini Bashing* aired on successive weeknights in August 2010. In one, Sicari played a husband who ridiculed his wife for wearing clothing some might consider unflattering. In the other episode, he played a shirtless, out-of-shape husband ridiculed by his wife as they walked on a boardwalk and a father who ridiculed his son for wearing unflat-

tering clothing. According to Sicari, the episodes were designed to draw attention to a person's right to express themselves without fear of their personal flaws.

In *Slip and Fall*, Sicari played the role of a supermarket manager who responded to staged slip and fall accidents. As he investigated the fall and cleaned up the area, he hoped the eyewitnesses would truthfully describe what they had observed. In *Overweight Shoppers*, he portrayed a supermarket manager who responded to complaints from shoppers about overweight customers being harassed by other patrons for buying foods high in sugar and fat. The episode was designed to permit the customers who had witnessed the harassment to express their reaction to the conduct. In *Food Stamps I and II*, Sicari played the part of a customer in line at a supermarket behind an actor posing as a patron using food stamps. The goal of the episode was to determine whether customers would assist the patron who did not have sufficient stamps to purchase the entire order. In the second episode, he played a customer critical of another actor posing as a customer using food stamps and of the food stamp program. The goal of that program was to determine whether other customers would assist the patron or join the criticism voiced by Sicari's character.

Sicari appeared in two other episodes staged at stores. In *You Break It You Buy It*, Sicari played a store manager at an expensive furniture store. The episode was designed to determine whether customers would disclose the identity of the shopper who broke an expensive vase. In *Gender Toy Shopping*, Sicari played the part of a customer who is offended by a father who let his son dress in girl's clothing in public. The episode was designed to determine whether the public would support the father and the child's choice to dress as he pleased. The goal of the episode was to highlight the right of people to express themselves through their choice of clothing.

Sicari also appeared in two episodes regarding interracial relationships. In *Interracial Parent Child*, Sicari played the part of a

waiter in a coffee shop who questioned and then refused to serve an interracial father and daughter. According to Sicari, the episode was designed to reinforce the right of individuals of different races to marry, have children, or adopt children of another race. In *Interracial Adoption*, he played the part of the manager of a diner where other actors staged a dispute over the decision of one to adopt a child of another race. The episode was designed to gauge other customers' reactions to the dispute and whether they would report the incident to the manager and what the customer would say. The goal of the episode was to highlight the challenges of interracial adoption.

In another episode, Sicari played a father who took his children, also actors, to a diner and let them run wild. The episode was designed to assess the reaction of other customers to the father's nonchalance. In *Fugitive Recovery*, Sicari played a Fugitive Recovery Agent who distributed fliers of a "wanted" person to customers of the diner. An actor entered the diner who resembled the photograph of the person on the flier. The episode was designed to gauge whether patrons noticed the resemblance and, if so, what action they took. In another episode set in a diner, Sicari played the role of a patron who refused to sit next to a person or to be served by a person who he knew had AIDS. The goal of the program was to educate people about the reality of the disease and unfounded fears of the manner of transmission.

Finally, Sicari appeared in an episode entitled *Deaf Abuse* as the store manager who refused to hire a person because she was deaf. The episode was designed to determine the reaction of non-actors to the conduct of the store manager.

B. Comedy Performances

Sicari provided a DVD containing three recordings: (1) *From the Heart—Legal Laughter* with Vince August; (2) Friars Club Standup; and (3) Carolines. We highlight certain comments in each recording.

During his monologue in *From the Heart*, Sicari said, "Barack won. And its weird, because, like, I voted for him. But, I almost don't know . . . do I congratulate black people?" Sicari had been serving as a municipal court judge for almost a year before the election was held and that comment was made.

In the Friars Club clip, Sicari as Vince August participated in a roast of Vincent Pastore, an actor who appeared in the popular television show *The Sopranos* as Salvatore "Big Pussy" Bonpensiero. Sicari named other roles Pastore had played and then asked: "Do you realize that 'Big Pussy' was the most masculine role you actually had?" Commenting on Pastore's name, he said, "Vincent Pastore, which we know comes from pastor. We know what pastors like to do with little boys." Then he stated, "You need a real Italian name. Pat Cooper, Frank Vincent, Vince August. These are names handed down generation after generation by FBI witness protection programs."

In a single clip from his many performances at Carolines, a well-known comedy club in New York City at which Sicari regularly appeared as Vince August, he related that "he hates kids." He described them as "awful," "soft," "spoiled," and "creepy." He informed the Advisory Committee that his routines are partly improvisational and partly dependent on current events. Each routine is different. He admits that demeaning comments, often self-directed and based on his personal experiences growing-up in an Italian–American Catholic family, are the foundation of his routines.

## C. *Vinsanity*

On his former website, Judge Sicari listed his television and film credits, including a film entitled *Vinsanity*. He described it as "a one man comedy concert/Independent Film starring Vince August that won BEST COMEDY at the Los Angeles premiere of the New York International Independent Film and Video Festival." He stated that he wrote, starred in, and directed the film and included a link to the trailer for the movie. He considers it the

centerpiece of his career to date. Judge Sicari took down the website, did not send the film to the Advisory Committee, and reports that he is unable to provide a copy of the film for our review.

## VI.

Sicari contends that his entertainment career cannot create ethical concerns for him as a municipal court judge because he has kept the two careers separate. He also relies on *In re Broadbelt, supra*, emphasizing that it discusses television and other media appearances that concern discussion of current legal issues or pending or contemplated litigation. He maintains he has not run afoul of any canon of the *Code of Judicial Conduct* because he has carefully and completely refrained from any jokes about law in general or pending cases.

Sicari's reliance on *In re Broadbelt* is misplaced. It addresses an appearance by a judge on a television or radio show, once or on a recurring basis, to discuss a legal issue or to comment on a pending case in this or other jurisdictions. In *In re Broadbelt, supra*, we noted that our discussion of the judge's recurring appearance on two nationally broadcasted shows was limited to his discussion of pending cases. 146 *N.J.* at 511, 683 *A.2d* 543. This Court also noted that *In re Broadbelt* presented the first opportunity for us to discuss the propriety of an appearance by a sitting judge on television. *Id.* at 512, 683 *A.2d* 543. We clearly did not contemplate the precise situation before us now at that time.

Moreover, the record belies his assertion that he has constructed two watertight vocational paths—law and comedy. The *Bergen Record* discovered that Vince A. Sicari, the lawyer, and Vince August, the actor and comedian, are the same person. That newspaper readily associated Judge Sicari with Vince August soon after his appointment, and we have little doubt others, who have attended the various comedy clubs at which he regularly performs or have viewed *What Would You Do?*, have made or will make the same association. Once a person makes that association, the

concern is whether an ordinary member of the public can divorce the comedy routine or the roles played by Vince August from Judge Sicari.

We presume that most people who watch a complete episode of *What Would You Do?* would appreciate that the person harassing the woman using food stamps, the gay men in a sports bar, the same sex couple at the diner, or the young African–American woman in the store, is an actor following a script. The same cannot be said about the person who starts to watch an episode, is horrified at what he or she sees and hears, and changes the channel before realizing it is a staged encounter, or the person who realizes it is staged but is outraged that the topic of racial or sexual identity discrimination is presented as entertainment.

Similarly, we cannot discount the possibility that a person who has attended a comedy club in New York City will find himself or herself before Judge Sicari in South Hackensack. In the course of his routines, he has demeaned certain people based on national origin and religion, has revealed his political leanings, and has declared his dislike for and intolerance of children. To be sure, the routines are designed to be funny. We must acknowledge, however, that many regard the maxim "many a true word is said in jest" [3] as a fundamental truth. We cannot ignore the distinct possibility that a person, who has heard a routine founded on humor disparaging certain ethnic groups and religions, will not be able to readily accept that the judge before whom he or she appears can maintain the objectivity and impartiality that must govern all municipal court proceedings.

In this matter, Sicari has not produced a copy of *Vinsanity,* the award-winning, independent film he wrote, directed, and produced, and he has provided only one clip of his many appearances at the comedy club at which he regularly appears. Judge Sicari inquired whether his comedy and acting career was compatible with the canons governing his municipal court judicial position. The Advi-

---

[3] The maxim has been traced to Chaucer's *Canterbury Tales* published in 1390.

sory Committee opined that his professional comedic and acting activities had the capacity to demean and denigrate the integrity of the court. Sicari sought reconsideration and supplied more material to the Advisory Committee, much of which had been supplied already. Still, notably missing is a copy of *Vinsanity*, a piece Sicari describes as the centerpiece of his comedic work. It is stunning that Sicari could not find a copy of the film to permit its review and an assessment of whether the performance has the capacity to demean or compromise the integrity of the court.

The failure to produce *Vinsanity* permits this Court to infer that it is replete with humor that is not befitting a municipal court judge. Such humor by a sitting judge has the clear capacity to demean his judicial office and casts doubt on the judge's ability to act impartially. Similarly, although the routine from the comedy club is relatively benign, the failure to supply more than a single clip leads to the inevitable inference that many, if not most, of his other routines are not so benign and express views about ethnic groups, religions, and religious practices that can demean the integrity of the court.

The municipal courts in New Jersey handled more than 6.1 million matters in the 2011–12 court year. The municipal court is the only court in which most people will ever appear. It is the face of the judiciary in this state. It is, therefore, imperative that a municipal court judge conduct the proceedings in his or her court fairly, impartially, and in accordance with appropriate standards of decorum. It is also imperative that the judge conduct his or her personal and professional life in a manner to avoid disparaging the role of the municipal court in our system of justice.

Judges are held to high standards of conduct. *In re Advisory Letter No. 7–11, supra,* 213 *N.J.* at 71, 61 *A.*3d 136. They may not conduct themselves in public in any manner that may lead ordinary members of the public to hold the court in disrepute. *DeNike, supra,* 196 *N.J.* at 514, 958 *A.*2d 446. They must refrain from any comments that would allow an ordinary

person to conclude that the judge cannot be impartial. *In re Yaccarino*, 101 *N.J.* 342, 354–55, 502 *A.*2d 3 (1985).

■ We acknowledge the record contains no evidence that Judge Sicari has ever conducted proceedings in his courtroom in any other manner than a professional one. However, the problem presented by this appeal lies in the distinct possibility that a litigant, witness, or attorney appearing before Judge Sicari will recognize him as Vince August, the actor and comedian. For that reason, we must consider whether the litigant, witness, or attorney can reasonably believe that the man who crafts comedy routines demeaning his ethnic and religious upbringing and accepts roles that regularly disparage the needy, handicapped, and overweight and roles that harass racial minorities and sexual orientation can impartially and objectively adjudicate the case before him without regard to race, national origin, sexual identity, religion, weight, financial stability, or any of the myriad human conditions disparaged in his self-crafted routines and scripted roles. *See Kane Props., LLC v. City of Hoboken,* 214 *N.J.* 199, 222–23, 68 *A.*3d 1274 (2013) (emphasizing that the appearance of impropriety remains the standard governing judges and those performing quasi-judicial acts).

Vincenzo A. Sicari, the lawyer, may be free to pursue a parallel career as an actor and comedian. Once he chose also to serve as a municipal court judge, however, he became subject to the *Code of Judicial Conduct.* Once he chose to serve as a municipal court judge, his conduct outside the courtroom became subject to a higher standard. He may not pursue any activity that has the capacity to demean his judicial office or causes anyone to question his impartiality. Here, the focus of his comedy and his decision to participate in a pseudo-reality television show in situations that demean, ridicule, or embarrass others based on their race, religion, gender, sexual orientation, marital status, or physical characteristic are simply not consistent with the high standards of conduct expected of a judge.

## VII.

We, therefore, agree with the Advisory Committee and hold that Sicari may not serve as a municipal court judge while continuing his acting and comedy career.

*For affirmance*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, HOENS and PATTERSON, and Judges RODRIGUEZ (temporarily assigned) and CUFF (temporarily assigned)—7.

*Opposed*—None.